**FUNCTIONAL MUSIC, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION, Appellee.**

**FUNCTIONAL MUSIC, INC., Petitioner,**

v.

**UNITED STATES of America, Federal
Communications Commission,
Respondents.**

Nos. 14374, 14375.

United States Court of Appeals
District of Columbia Circuit.

Argued June 10, 1958.

Decided Nov. 7, 1958.

Certiorari Denied Oct. 12, 1959.
See 80 S.Ct. 50.

Petition for Rehearing En Banc Denied
Jan. 15, 1959.

Danaher, Circuit Judge, dissented.

Mr. Paul A. Porter, Washington, D. C., with whom Messrs. George Bunn and William P. Sims, Jr., Washington, D. C., were on the brief, for appellant in No. 14374 and petitioner in No. 14375.

Mr. Henry Geller, Atty., Dept. of Justice, with whom Messrs. Warren E. Baker, Gen. Counsel, Federal Communications Commission, Richard A. Solomon, Asst. Gen. Counsel, Federal Communications Commission, and Joel Rosenbloom, Counsel, Federal Communications Commission, were on the brief, for appellee in No. 14374 and respondents in No. 14375.

Mr. Daniel M. Friedman, Atty., Dept. of Justice, also entered an appearance for respondent United States of America in No. 14375.

Before EDGERTON, BAZELON and DAN-AHER, Circuit Judges.

BAZELON, Circuit Judge.

Functional Music, Inc., seeks judicial review of rules promulgated by the Federal Communications Commission in 1955, which rules restrict the practices of FM licensees furnishing a radio music service on a subscription basis. In doubt as to whether review was authorized by § 402(a) or by § 402(b) of the Federal Communications Act, Functional initiated review proceedings under each provision as a precautionary measure.

Petitioner-appellant is the licensee of FM broadcasting station WFMF, Chicago. Since 1949 it has restricted its program format predominately to background music. Additionally, it has superimposed upon traditional broadcasting services, a subscription music operation.[1] Subscribers, typified by restaurants, stores, schools and comparable institutions, receive petitioner's regularly scheduled broadcasts, but with all advertising matter received by the ordinary listener deleted. To effect this deletion, petitioner, immediately before and immediately after the broadcast of any advertising matter, transmits a supersonic signal which activates special equipment installed in subscribers' receivers to cut off and afterwards re-connect the broadcast signal. It is purportedly for the emission by petitioner of this inaudible signal that subscribers are willing to pay the subscription fee. Revenue resulting from the subscription service has, in fact, formed the major portion of petitioner's income. Petitioner, however, also receives substantial revenue from sale of time to advertisers for spot announcements. And

---

1. Among the broadcasters engaging in such a service, and the subscribers receiving it, this service is variously termed "functional music," "background music," "planned music" and "storecasting."

Whatever the name, the basic purpose is to provide a pleasant but unobtrusive background music atmosphere in subscribers' places of business.

among the general Chicago radio audience, WFMF has been highly popular.[2]

In 1950 the Commission, for the purpose of formulating a policy to govern "functional programming," commenced a study of the practices of broadcasters engaging in FM subscription services. Particular interest was manifest in the factor of program control by the subscribing party, since the Commission feared that background music programming, which is highly specialized and directly adaptable to subscribers' needs, was formulated in their interest rather than that of the general public. On December 31, 1953, the Commission released a notice of proposed rule making which suggested that functional music operations did not constitute broadcasting as defined by § 3(o) of the Communications Act.[3] From this suggestion, the Commission concluded that functional programming was not properly transmittable by a station licensed to provide a broadcasting service. The Commission did not propose, however, discontinuance of the subscription service altogether; it recognized that the resulting revenue was vital to growth of the infant FM industry. Rather, it proposed that functional programming be relegated to a basis subsidiary to the regular broadcasting commitment by emission as a secondary signal on a multiplexed transmission system—a recently devised electronic system allowing transmission of multiple signals upon a standard allocated FM channel.[4]

After conducting hearings, the Commission in 1955 established rules which in substance adopted the changes proposed in 1955.[5] The compulsory multiplexing requirement was postponed for a one-year period, however, due to a general unavailability of the requisite multiplexing equipment. From time to time, the multiplexing requirement was additionally postponed for like reason. In late 1957, shortly before the expiration of the most recent grace period, Functional Music petitioned the Commission to eliminate the multiplexing requirement altogether, or, in the alternative, to allow an additional blanket postponement of the multiplexing rules. On December 11, 1957, this petition was denied.[6] From the Commission's refusal in March of 1958 to reconsider its deci-

2. Surveys conducted in 1955 show WFMF, during the evening hours, to be the most popular FM-only station, and the fifth most popular of all stations, in the Chicago area.

3. " 'Broadcasting' means the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations." 48 Stat. 1065 (1934), 47 U.S.C.A. § 153(o) (1952).

4. Theretofore, FM communications had been transmitted on a so-called "simplex" basis, with each allocated FM channel supporting but one FM signal. Licensees engaging in a functional music service emitted a single signal capable of reaching both subscribers and the listening public; special receiving equipment in the subscribers' place of business was used to tailor this signal to their peculiar needs.

5. The Commission determined that functional music operations were non-broadcasting in nature. It established a 36-hour per week, 5-hour per day, minimum broadcasting commitment, prescribing this as a period during which FM licensees operating on a simplex basis could conduct only broadcasting services. Additionally, the Commission created a Subsidiary Communications Authorization—SCA—tied to and directly dependent upon the existence of an FM broadcasting license; the SCA authorized FM licensees to engage in a limited type of non-broadcasting activities—functional music programming. Such non-broadcasting activities could be conducted at any time if the licensee operated on a multiplexed transmission system. If the licensee operated on a simplex basis, however, functional programming was authorized only when the licensee was not fulfilling its 36-hour per week broadcasting commitment. SCA's on a simplex basis were to be available only during the one-year period following the effective date of the rules.

6. Petitioning for amendment of the rules to expunge altogether the multiplexing requirement, Functional asserted that the Commission's recent authorization of subscription television services on frequencies regularly assigned to television broadcasting had undercut the legal

sion of December 11, petitioner timely sought judicial review here, alleging the invalidity of the 1955 rules and hence the invalidity of the 1958 order implementing those rules.

While the parties have not specifically put in question our jurisdiction to examine the validity of the 1955 rules in these proceedings, jurisdiction is, of course, always a threshold consideration.

 The rules here attacked were initially promulgated in 1955. It very well may be that they were then sufficiently final to support judicial review.[7] No such review had been sought, however. And as to those rules, the statutory period specified for review of, or appeal from, Commission orders and

decisions has now long since passed.[8] Nevertheless, we are persuaded that judicial examination is now permissible.[9] As applied to rules and regulations, the statutory time limit restricting judicial review of Commission action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it. For unlike ordinary adjudicatory orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity. And see Columbia-Broadcast-

foundation for the restrictions placed on FM subscription operations. Functional sought to justify its alternative request, that the mandatory multiplexing requirement be postponed for an additional year, on the basis of continuing technical difficulties remaining in a multiplex system, and continuing unavailability of adequate multiplexing equipment.

*Without discussion,* the Commission adhered to its earlier conclusion that an FM functional music service was not broadcasting. Arguing that two and a half years had elapsed since announcement of a multiplex requirement, that multiplexing was a feasible communication system, and that sufficient multiplexing equipment was then available to fill the needs of functional broadcasters, the Commission denied a blanket postponement of the multiplexing requirement. It recognized, however, that an immediate simplex termination might be unduly harsh as to licensees then in the throes of converting their simplex equipment to multiplex equipment. The Commission therefore provided for individual short-term waivers of the multiplexing rules for FM broadcasters then engaged in equipment conversion. To afford the Commission sufficient time to process applications for such a waiver, permissible simplexing was extended for a two-month period.

7. See, e. g., Columbia Broadcasting System v. United States, 1941, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563.

8. Judicial review of action of the Federal Communications Commission is provided for by the terms of §§ 402(a) and

(b) of the Communications Act, 48 Stat. 926 and 1093 (1934), as amended, 47 U.S. C.A. § 402(a) and (b). See note 10 infra. Section 402(a), incorporating by reference the provisions of Chapter 19A, Title 5, 64 Stat. 1129–1132 (1950), 5 U.S.C.A. §§ 1031–1042, specifies that review of orders contemplated by that section may be sought within sixty days of the time at which such orders become final. Section 402(b) establishes a thirty-day period during which designated orders and decisions of the Commission may be appealed.

9. Functional's accession to the Commission rules, and to the underlying basis for those rules, during the considerable period between the original rule-making proceeding and the 1957 application for amendment of the rules does not estop it from contesting here the validity of those rules. During that period, Functional conformed its programming to adhere to the 36-hour per week minimum broadcasting commitment; in its repeated requests for postponement of the multiplexing requirement, it alleged use of best efforts to convert to a multiplexing system. However, conforming to the dictates of invalid administrative action does not estop a party from subsequently contesting that very action. California-Oregon Power Co. v. Federal Power Comm., 1956, 99 U.S.App.D.C. 263, 239 F.2d 426; Standard Airlines v. Civil Aeronautics Board, 1949, 85 U.S. App.D.C. 29, 177 F.2d 18; Peoples Bank v. Eccles, 1947, 82 U.S.App.D.C. 126, 161 F.2d 636, reversed on other grounds 1948, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784.

ing System v. United States, 1941, 316 U.S. 407, 421, 62 S.Ct. 1194, 86 L.Ed. 1563, for example, where the Supreme Court clearly contemplated the continuing availability of review of Communications Commission rules and regulations.

■ Sections 402(a) and 402(b) of the Communications Act, under which these review proceedings have been initiated, are by definition mutually exclusive.[10] The proper delineation of these two provisions has been a source of considerable difficulty to litigants in the past.[11] Functional argues that the Commission's 1958 decision, affirming the December 11, 1957 order to multiplex, effected a modification of its broadcasting license and therefore that appeal will lie under § 402(b).[12] Paradoxically, determination of this question is dependent upon resolution of the merits of the appeal.[13] For whether or not a modification occurred as a result of the 1958 order depends upon the validity of the rules. If the 1955 rules were valid, the license was modified in that year; petitioner's license was renewed subsequent to promulgation of the rules, and a licensee takes his license subject to all valid outstanding rules and regulations.[14] On the other hand, if the

10. "(a) Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 19A of Title 5. [48 Stat. 926 (1934), as amended, 47 U.S.C.[A.] § 402 (a) (1952)].

"(b) Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia * * * " by, *inter alia*, an applicant for a construction permit or station license, or by an applicant for a renewal, modification, transfer, or assignment of such an instrument, whose application has been denied; by any party aggrieved by an order granting or denying such an application; or by the holder of a construction permit or station license whose authorization has been revoked, modified, or suspended by the Commission.

The orders reviewable under each of the two provisions are not intrinsically different. Scripps-Howard Radio Co. v. Federal Communications Comm., 1941, 316 U.S. 4, 8, 62 S.Ct. 875, 86 L.Ed. 1229. The orders encompassed by § 402(b) directly affect the radio-licensing function of the Commission, and in the interest of uniformity, appeal therefrom is concentrated in the Court of Appeals for the District of Columbia Circuit. All other Commission orders may be reviewed alternatively in the Court of Appeals for the Circuit where the party resides or has its principal office, or in the Court of Appeals for the District of Columbia Circuit. 64 Stat. 1130 (1950), 5 U.S.C.A. § 1033 (1952). A statutory revision in 1952 broadened the class of orders included within § 402(b). H.R.Rep. No. 1750, 82d Cong., 2d Sess. 16 (1952); S.Rep.No. 42, 82d Cong., 1st Sess. 11 (1951).

11. See, e. g., Metropolitan Television Co. v. United States, 1955, 95 U.S.App.D.C. 326, 221 F.2d 879; Columbia Broadcasting System of California v. Federal Communications Comm., 1954, 93 U.S.App. D.C. 399, 211 F.2d 644.

12. In its petition for rehearing of the Commission's order and report of December 11, 1957, Functional alleged that the mandatory multiplexing resulting from that order effected a modification of its existing station license, and demanded the hearing required by § 316(a) of the Communications Act, 48 Stat. 1088 (1934), as amended, 47 U.S.C.A. § 316 (a). That section authorizes the Commission to modify any existent construction permit or station license, but also entitles the holder of such an instrument to a public hearing on "why such order of modification should not issue * * *." This hearing was refused by the Commission, which has alleged that no modification occurred as a result of that order.

13. For a prior example of use of a "jurisdiction to determine jurisdiction" approach in deciding upon the applicability of statutory review provisions, see Music Broadcasting Co. v. Federal Communications Comm., 1954, 95 U.S.App.D.C. 12, 217 F.2d 339.

14. See, e. g., Columbia Broadcasting System v. United States, 1941, 316 U.S. 407, 418, 62 S.Ct. 1194, 86 L.Ed. 1563; Chapman v. Sheridan-Wyoming Coal Co., 1950, 338 U.S. 621, 629, 70 S.Ct. 392, 94 L.Ed. 393; Illinois Steel Co. v. Baltimore & O. R. Co., 1942, 320 U.S. 508, 511, 64 S.Ct. 322, 88 L.Ed. 259.

rules were invalid, they are a nullity and therefore incapable of effecting a modification of the license.[15] In that event, it is the 1958 order, requiring petitioner, and those broadcasters similarly situated, to multiplex or discontinue functional programming, which imposes a modification and which therefore may be appealed from under § 402(b) (5).[16]

Consequently, we proceed to an examination of the 1955 rules. Those rules, restricting the operation of a subscription music service by FM licensees, rest on the Commission's determination that such functional programming is not broadcasting within the meaning of § 3(o) of the Communications Act. According to the Commission, various practices of functional broadcasters, namely, presentation of a highly specialized program format, deletion of advertising from subscribers' receivers, and exaction of a charge for these services, dictated a finding that functional music operations constitute point-to-point communications. And in its brief, the Commission sought to illustrate this conclusion by likening petitioner's functional music service to other services held to be point-to-point communications. In Bremer Broadcasting Co., 2 F.C.C. 79 (1935), for example, transmission of coded horse-race results was held to be a service not covered by a license to broadcast. And similar treatment was accorded messages transmitted for a local police department (Adelaide Lillian Carrell, et al., 7 F.C.C. 219 (1939)), and programs furnishing spiritual, vocational and marital advice to specified listeners (Scroggin & Company Bank, 1 F.C.C. 194 (1935)).

■ However, the practices pointed to by the Commission do not form a basis for concluding that functional operations are non-broadcasting in nature. Nor do we believe that the cases cited in the brief are in point. For the Communications Act specifies that broadcasting is "the dissemination of radio communications intended to be received by the public * * *." [17] And program specialization and/or control is not necessarily determinative of this requisite intent, and therefore dispositive of broadcasting status, as the Commission assumed. Broadcasting remains broadcasting even though a segment of those capable of receiving the broadcast signal are equipped to delete a portion of that signal. In contrast to the objectionable service in the cited cases, which by its very nature negates an intent for *public* distribution, functional programming can be, and is, of interest to the *general* radio audience. Petitioner, for example, has acquired a high degree of popularity with the Chicago free listening audience. Moreover, it receives substantial and growing revenues from advertisers specifically desiring to reach that audience. In this light, a finding that the programming of petitioner and broadcasters comparably situated is not directed to, and intended to be received by, the public generally is clearly erroneous. Transmitted with the intent contemplated by § 3(o), such programming therefore has the requisite attributes of broadcasting.[18]

Whether or not petitioner's functional music service may be barred as ob-

---

15. E. g., Manhattan General Equipment Co. v. Commissioner, 1935, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528. And see note 9 supra.

16. The 1958 order required petitioner immediately to vary its broadcasting practice or face potential criminal sanctions for non-compliance. 48 Stat. 1100 (1934), as amended, 47 U.S.C.A. § 501. Therefore, the 1958 order had an immediate impact on petitioner, even though the validity of the order is entirely dependent

upon the validity of the 1955 rules. Varney v. Warehime, 6 Cir., 1945, 147 F.2d 238, 243. Cf. Columbia Broadcasting System v. United States, supra.

17. Section 3(o), 48 Stat. 1065 (1934), 47 U.S.C.A. § 153(o) (1952).

18. In the view which we take of this case, it is unnecessary to resolve the much contested question of whether or not customers in subscribers' places of business constitute the "public" for purposes of § 3(o).

jectionable for reasons other than its supposed status as a non-broadcasting service is not before us. We merely conclude that the reasons which the Commission relies upon do not support its action in barring functional music. Securities and Exchange Comm. v. Chenery Corp., 1947, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995. The petition for review in No. 14375, brought under § 402(a), is accordingly dismissed. In No. 14374, brought under § 402(b), the order of the Commission is vacated and the case is remanded for such further action as the Commission is advised to take in light of this decision.

So ordered.

DANAHER, Circuit Judge (dissenting).

The Commission had distributed FM radio frequencies pursuant to an allocation plan as distinguished from AM frequencies granted in response to specific applications. Logansport Broadcasting Corp. v. United States, 1954, 93 U.S.App.D.C. 342, 345, 210 F.2d 24, 27. It has been seeking to allocate FM channels in the public interest so as to achieve a more effective use of the frequency space assigned for FM broadcasting. The Commission recognized, however, that FM had fallen short of development of a sound economic base.

Various licensees, including WFMF, prior to rule-making, had undertaken by means of simplex transmission to exploit a functional music operation in an endeavor to compete in the general radio advertising market. The Commission inaugurated studies of developments in this field which culminated, after a period of years, with the issuance on December 31, 1953 of a notice of proposed rule-making. The Commission emphasized that the FM broadcast band was not to be converted to some new specialized non-broadcast service or services. On the contrary, the Commission decided to grant special communications authorizations only to permit a subsidiary service as an adjunct to the main undertaking, namely, use of the already allocated FM frequency to accomplish an FM broadcast service to the public.

In the notice of proposed rule-making with regard to functional music, the Commission specifically invited comments directed toward its tentative conclusion that functional music was not "broadcasting." WFMF, with other FM licensees who had already been experimenting with functional music operations, submitted comment, and after the Commission on March 22, 1955 had issued its report and order, they filed petitions for reconsideration. They argued then that functional music services were broadcasting. The petitions for reconsideration, including that of Station WFMF, were denied, and neither the licensee of WFMF nor any other licensee appealed, either from the Commission's report and order adopting the new rules or from the orders denying the petitions for reconsideration.

Clearly, then, when petitioner's FM license had expired and thereafter was renewed in 1955, it was taken subject to the Commission's determination that functional music operations would be authorized only pursuant to an SCA, secondary in nature and deemed to have no status whatever apart from the FM license. WFMF and the entire industry were on notice that the Commission would authorize only "multiplex" transmission by which there might be simultaneous transmission of two or more signals within a single channel. The Commission made it abundantly clear that an FM broadcast band, already allocated to a particular area in the public interest, was not to be converted in large degree to commercial or industrial operations where the subscribers, and not the public, would control the receiving sets, decide when they should operate, at what volume, and what portions of what programs were to be deleted. In short, the Commission decided as a matter of policy, that FM bands were to be used for the purpose for which they had been allocated, and that functional music operations might be authorized on those FM bands only in a manner subsidiary to

the main broadcasting service from which the licensee was to draw its financial sustenance. Its policy was evolved in the public interest, and was designed to achieve a far more effective use of the allocated FM frequencies, with greater opportunity to more licensees to achieve economically feasible FM broadcasting. The Commission's findings do not lack substantial support in the record. Various petitioners already in the simplex field were granted extensions of the period within which they were to convert from simplex to multiplex transmission. Each licensee, including WF MF, at the time it filed its application for renewal was bound by the provisions of 47 U.S.C.A. § 301, and particularly in accordance with § 304, must have waived any claim to the use of any "particular frequency or of the ether as against the regulatory power of the United States because of previous use of the same, whether by license or otherwise."

Thus, the earlier permitted use of simplex conferred no right upon WFMF, nor was its FM license modified when, later, the period of permitted use of simplex was terminated. Rather, the petitioner, was bound to conform to the terms of the FM allocation for which it had applied and to which it had agreed. In sum, our petitioner possessed thereafter no vested right to 900 subscribers or any other number. It had no vested right to a 50 to 60 mile coverage by simplex as distinguished from half that distance by multiplex. It had no vested right to freedom from competition. The Commission well may expect that areas including present WFMF subscribers who may not through multiplex be served by this petitioner, will receive service from some other FM licensee which may undertake FM broadcasting in the area if assured of a measure of financial support. In any event the use of FM frequencies for broadcasting and not for special subscription services is the objective, and we should not say it is not a proper one.

From the present record, we were shown that there now are 96 subsidiary communications authorizations outstanding for functional music by FM broadcast stations. Of these, 59 pursuant to the rule, are engaged in multiplex transmission. In areas where feasible and where suitable equipment is or will become available, the Commission, no doubt, is justified in expecting other FM stations will convert to bring themselves in conformity with the 1955 rule, as the 59 have already done.

As noted, the Commission's functional music rules were adopted after protracted rule-making proceedings in which all parties, including WFMF, had ample opportunity to present their views. In my judgment the Commission is commanded by the Act to accomplish the objectives it sought here to achieve. The Commission simply decided that the specialized simplex service was not to be permitted to pre-empt the valuable spectrum space allocated to FM frequencies intended to be devoted to broadcasting. This was a public interest determination required to be made by law. Thus the Commission's rule-making was entirely within the Commission's competence.

"The Communications Act must be read as a whole and with appreciation of the responsibilities of the body charged with its fair and efficient operation. The growing complexity of our economy induced the Congress to place regulation of businesses like communication in specialized agencies with broad powers. Courts are slow to interfere with their conclusions when reconcilable with statutory directions." United States v. Storer Broadcasting Co., 1956, 351 U.S. 192, 203, 76 S.Ct. 763, 770, 100 L.Ed. 1081; cf. Federal Communications Comm. v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 144–146, 60 S.Ct. 437, 84 L.Ed. 656; Federal Communications Comm. v. W J R, 1949, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353.

I think we are bound to affirm the Commission's action.