LICORERÍA TRIGO, INC., Plaintiff and Appellant, *v.* SECRETARY OF THE TREASURY, Defendant and Appellee.

No. R-65-201.    Decided April 7, 1967.

258

*Brown, Newsom, Córdova & Díaz* for appellant. *J. B. Fernández Badillo, Solicitor General, J. F. Rodríguez Rivera, Acting Solicitor General,* and *Elpidio Arcaya, Assistant Solicitor General,* for appellee.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RIGAU delivered the opinion of the Court.

From October 1960 to October 1961, petitioner, *Licorería Trigo, Inc.,* was the exclusive importer of Brandy Domecq Tres Cepas. Said product was sold exclusively to *Trigo Her-*

*manos, Inc.*, for the price which did not exceed $5 per "wine-gallon," excluding internal-revenue taxes.[1] The import of the brandy resulted in the imposition of a tax at the rate of $6 per wine-gallon, which was paid by petitioner before withdrawing the shipments from customs.

The legal provision which authorized the levying of these taxes is found in 13 L.P.R.A. § 1531 which in its pertinent part reads as follows:

"There shall be levied, collected, and paid, once only, on the following products now stored or that have been, or may hereafter be, distilled, rectified, produced or manufactured in, or imported or introduced into, Puerto Rico, an internal-revenue tax at the following rates:

"(1) (a) All distilled spirits obtained through fermentation and distillation of any products other than those derived from sugarcane, below 100° proof, whose 'wholesale price in the Puerto Rico market' does not exceed five (5) dollars a wine gallon, shall pay a tax of six (6) dollars on each wine gallon, and a proportional tax at a like rate on every fraction of a wine gallon.

"All distilled spirits obtained through fermentation and distillation of any products other than those derived from sugarcane, below 100° proof, whose 'wholesale price in the Puerto Rico market' exceeds five (5) dollars but does not exceed twenty (20) dollars a wine gallon, shall pay a tax of nine (9) dollars on each wine gallon, and a proportional tax at a like rate on every fraction of a wine gallon."[2]

■ The act defined the term "wholesale price in the Puerto Rico market" in this manner: "Means the highest price, excluding the taxes prescribed in this subtitle, charged

---

[1] The Act defines "wine-gallon" as "The standard liquid measure, universally recognized, containing 231 cubic inches." 13 L.P.R.A. § 1474 (17). In the new § 1474 said definition appears in subsection 20. See the Supplement.

[2] In the course of this opinion we shall say the act "authorized" and the act "defined", etc. instead of saying "authorizes" or "defines", etc. because the Spirits and Alcoholic Beverages Act was amended by Act No. 69 of June 20, 1963, 13 L.P.R.A. § 1474 *et seq.*, Supplement.

to or collected *from the retailer*, directly or indirectly, by the introducer or manufacturer, or the distributor or wholesaler, as the case may be." 13 L.P.R.A. § 1474 (28). (Italics ours.)

On April 30, 1959, the Director of the Bureau of Alcoholic Beverages and Narcotics stated through a letter sent to Trigo Hnos., Inc., that "the wholesale price for the purposes of determining the rate of the tax which shall govern on certain distilled spirits is the one established by the importer or manufacturer when selling said liquor."

■ Subsequently the Secretary of the Treasury learned that there were four importers of alcoholic beverages which were engaged in a practice called *"trampolín"* (springboard) which involved the importing and paying of the taxes. At the hearing of this case the Assistant Director of the Bureau of Alcoholic Beverages of the Department of the Treasury explained what was meant by the term *"trampolín"*. He said:

" *'Trampolín'* is a practice. Importers call it thus. It is a commercial practice in which a fictitious importer is appointed to act as immediate importer of the merchandise into Puerto Rico, and he conveys it immediately to the real importer. The fictitious importer upon conveying the merchandise to the real one, billed him at a price, the real price, which justified the payment of the tax at a lower rate. In this manner, the real importer resold it to the retailers at higher prices, which justified the imposition of a higher tax." (Tr. Ev. 9–10.)

The Department of the Treasury investigated and found "that there were four importing firms which were purchasing and acquiring, all the shipments of certain products brought in by other firms. Those other firms did not sell to their customers, but exclusively to those wholesale firms." (Tr. Ev. 11.)

The following dialogue which took place during the trial while the Assistant Director of the Bureau of Alcoholic Beverages of the Department of the Treasury was testifying is

significant. Plaintiff was represented by Mr. Enrique Córdova Díaz and defendants by Mr. Elpidio Arcaya. Judge Plinio Pérez Marrero was presiding the courtroom.

MR. ARCAYA:

"Q. Could you state whether Licorería Trigo, Inc., was included among those importers who took advantage of the 'trampolín'?"

MR. CÓRDOVA DÍAZ:

"A. Yes, sir. It was one of those which for a specific period were engaged in the importation of Brandy Domecq Tres Cepas. From October 1960 to October 1961. Before and after those dates, the exclusive importer of that brand of Brandy had been Trigo Hermanos, Inc."

MR. CÓRDOVA DÍAZ: "That fact is specifically stipulated."

JUDGE PÉREZ MARRERO:

He is interpreting or explaining.

"Q. According to your testimony, was Licorería Trigo, Inc., a 'trampolín'?

"A. It was a 'trampolín'."

MR. CÓRDOVA DÍAZ:

"It was part of the 'trampolín'." (Tr. Ev. 11–12.)

The witness was asked which determinations were reached by the Secretary of the Treasury in discovering the use of the *trampolín* practice and the witness stated the following:

"The Secretary summoned all the importers of alcoholic beverages in Puerto Rico and warned them against this practice, which he believed was bad and he gave them a period of time in which to liquidate that stock on which taxes had been paid and which had been marketed under the practice of 'trampolín.' For the knowledge and future action of the Department, physical inventories of that stock were made on October 31 and November 30, 1961. We had knowledge of the stock in possession of each one of these gentlemen, with much lower taxes fixed by law in the scale, existing on October 31, 1961. Another physical inventory of the stock in possession of wholesale dealers was made on November 30, 1961. These practices continued after

December 1, while alcoholic beverages were sold at a price justifying a tax higher than the one they paid, for which reason all the firms were notified of this deficiency and were requested to pay the difference on those inventories, on that date. Of those firms, three paid." (Tr. Ev. 12–13.)

On August 31, 1961, the Secretary of the Treasury sent a Circular Letter to the importers of alcoholic beverages, among them Licorería Trigo, Inc., informing them, two months in advance that "As of November 1, 1961, the rate of the state tax on wines and strong beverages not derived from sugarcane, manufactured in or imported into Puerto Rico, shall be fixed on the highest wholesale price, excluding taxes, collected from the retailer by the importer or manufacturer, dealer or wholesaler, as the case may be." Exh. 3 of the Stipulation.

The Secretary indicated in said letter that "the date of November 1, 1961 has been fixed so that the purchases of liquors in transit at present may be introduced in the Puerto Rican market under the ruling in force."

On November 2, 1961, the Secretary of the Treasury sent a letter to Licorería Trigo, Inc., stating that since on November 1 of that same year, "there shall be in the possession of wholesalers, nonimporters, stocks of wine and strong beverages not derived from sugarcane, the taxes of which have been paid under the previous ruling at the lower rates, and since it may be sold to the retailer at a wholesale price justifying the payment of the tax at the highest rate according to the new ruling and since the importer of said liquors would be bound to pay the difference in the excise, a term of 30 days is granted as of November 1, 1961 in order that said stock be liquidated." Exh. 4 of the Stipulation.

On December 1, Trigo Hnos., Inc., had in stock not sold 8,996 boxes (15,013.20 wine-gallons) of the 34,900 boxes

bought from Licorería Trigo, Inc. These boxes paid taxes of $6 instead of $9 as required by law.[3]

On March 28, 1962, the Secretary of the Treasury notified plaintiff of a tax deficiency in relation to the 8,996 boxes of Brandy Domecq Tres Cepas. The Secretary granted Licorería Trigo, Inc., six installments to pay said tax, which amounted to $53,159.49 including interest. That amount was based on the $3 per gallon unpaid by plaintiff, that is, the difference between the $6 tax paid and the $9 tax required by law.

Petitioner paid under protest and on May 8, 1963, requested the Secretary of the Treasury to refund said payment. On May 23, 1963, the Secretary denied the petition for refund.

On May 28, 1963, petitioner filed a complaint for the refund of the tax. It alleged that the imposition of the tax deficiency was unlawful on the following grounds: (a) because it believed that the $3 per gallon requested by the Secretary, which was the difference between the $6 tax paid and the $9 tax which it was required to pay, was an "additional tax" not authorized by law; (b) because it believed that it had paid "the whole amount" of the taxes in question and that no additional tax should be collected; and (c) because plaintiff, Licorería Trigo, Inc., imported and sold the Brandy object of the taxes before December 1, 1961 and did not include in its selling price the "additional tax" in question.

The hearing of the case having been held the Superior Court denied the petition for refund. We granted plaintiff's petition to review the matter and we issued the writ.

In its petition for review petitioner sets forth the following grounds to attack the validity of the tax:

---

[3] Trigo Hnos., Inc., sells said liquor at a price which exceeds $5 but less than $20, therefore the tax of $9 on each wine-gallon is applicable, in accordance with the second paragraph of the aforecited subsection, 13 L.P.R.A. § 1531(1)(a).

(1) that "the pronouncement of November 2, 1961 was not an interpretation of the statute but a legislative decree which was retroactively applied and therefore its application was invalid and in violation of the statutory provisions and the new ruling effective on November 1, 1961";

(2) that "the new ruling of construction effective November 1, 1961, was clearly erroneous";

(3) that "the determination and collection of the original tax were final and definitive and the Secretary was neither empowered nor authorized to make a new determination and collection, or to notify a deficiency";

(4) that "the additional levying of taxes deprives plaintiff-appellant of its property without due process of law."

In its brief (p. 12) petitioner argues that the judgment rendered by the Superior Court should be reversed "because said court, in our opinion, committed the following errors:"

"I.—The court erred in deciding that the payment of the tax on the importation of the Brandy was not final and conclusive."

"II.—The Superior Court committed error in failing to give the force of law to the ruling of construction which was continued in effect until November 1, 1961 by the Secretary of the Treasury and in deciding that said Secretary had the power to repeal it retroactively."

"III.—The Superior Court committed error in deciding that petitioner's operations constituted an evasion from the payment of the excise taxes prescribed by the statute."

In the argument of the first error petitioner sets forth that the circular letter of November 2, 1961 was a legislative decree and that such act is in violation of the terms of the statute. It argues that the statute provides "that the taxes are levied, paid, and collected before removing the spirits from customs or the shipping company, and that the tax shall be levied, collected, and paid only once, importation being the taxable event."

In its argument, petitioner relies on an incorrect premise upon classifying the ruling established on November 2, 1961 by the Secretary of the Treasury as a legislative decree. It is not. The ruling in question is a rule of construction. It explains what should be understood by the tax rate levied on the basis of *the very definition given by the statute* to the phrase "wholesale price in the Puerto Rico market," which was the highest price, excluding taxes, collected from the retailer by the importer or wholesaler. 13 L.P.R.A. § 1474(28).

The contention that the tax payment became final and conclusive by the mere fact that upon importing the spirits the payment was approved by the Secretary of the Treasury rests on an error which we shall explain below.

■ The statute provided (and its new text also provides) that "there shall be levied, collected, and paid, once only . . . an internal-revenue tax at the following rates: . . ." 13 L.P.R.A. § 1531. This provision does not imply that when a tax liability arises the payment of a part thereof bars the collection of the remainder. What said provision means is that no additional tax shall be levied, after the tax has been paid *in full.*

In the instant case an internal revenue tax at the rate of only $6 was paid on the basis of the selling price charged by Licorería Trigo, Inc., to Trigo Hermanos, Inc. The parties accepted that if the selling price collected from *the retailer* would have been used as the tax basis, the rate "would have been $9 per wine-gallon." (Stipulation No. 15.) Precisely that was what the applicable law said: the "wholesale price in the Puerto Rico market," means the highest price, excluding taxes, collected from the retailer. 13 L.P.R.A. § 1474(28).

■ Petitioner's contention is that since *a* $6 tax was already paid as tax per wine-gallon, when the obli-

gation was to pay $9, the Secretary of the Treasury cannot collect the difference. We do not agree. The payment of a tax in an amount less than the amount owed does not make said payment final and conclusive and does not discharge the obligation which in effect is imposed by law. Tax laws, as any other laws, must be given a reasonable construction which seeks to effectuate the purpose and intent of the legislator. The first error assigned was not committed.

The fact that the Superior Court did not give the force of law "to the ruling of construction which was continued in effect until November 1, 1961 by the Secretary of the Treasury and in deciding that said Secretary had the power to repeal it retroactively" is assigned as second error.

In effect the Secretary of the Treasury substituted the former ruling of 1959 which established that "the wholesale price for the purposes of determining the tax rate which shall govern on certain distilled spirit is the one established by the importer or manufacturer when selling said liquor" by that of November 1, 1961, which establishes that "the rate of the state tax on wines and strong beverages not derived from sugarcane, manufactured in or imported into Puerto Rico, shall be fixed on the highest wholesale price, excluding taxes, collected from the retailers by the importer or manufacturer, dealer or wholesaler, as the case may be."

What really occurred when the Secretary issued his new ruling of November 1, 1961, was not that he legislated or changed the position of the Department as to the ground on which the collection of the tax was based, instead what actually happened was that when the Secretary of the Treasury became aware of the practice of *"trampolín"* he changed the language of his ruling to prevent the evasion of payment of the tax hereinbefore described.[4]

---

[4] As a matter of fact Trigo Hnos., Inc., resumed its operation of importer subsequent to October 1961, which operation it performed prior to October 1960.

Previously the ruling established that the price for the purposes of determining the rate of the tax was "the one established by the importer or manufacturer when selling said liquor." The four firms which used the *"trampolin"* circumvented the ruling. In the case at bar an "importing" corporation sold the stock at a certain price to a sister corporation which in turn resold it. The result was that instead of paying the $9 tax per wine-gallon it paid $6 only. When the Secretary brought this to the attention of the four firms which were involved in that practice, three of them paid. But not petitioner. The new language of the Secretary's ruling of November 1, 1961 drafted then with the aforementioned experience follows more closely the language and intent of the statute. It establishes that "the rate of the state tax on wines and strong beverages not derived from sugarcane, manufactured in or imported into Puerto Rico, shall be fixed on the highest wholesale price, excluding taxes, collected from the retailer by the importer or manufacturer, the dealer or wholesaler, as the case may be." It suffices to compare the language of the new ruling—which was essentially an amendment to the former—to realize that the new ruling follows more closely, and at times exactly, the aforecited provisions of the act which defined "wholesale price in the Puerto Rico market." 13 L.P.R.A. § 1474 (28).

██ Neither the Secretary nor the taxpayer may alter or amend the law. The Secretary as well as the taxpayer each makes his own interpretation of the law, and in case of discrepancy or of litigation, it is incumbent upon the courts to construe and apply the law.[5] As properly admitted by petitioner itself, in its elaborate—and as to its organization and format, impeccable—brief (p. 15) the Secretary's interpretative ruling is not void because of the mere fact that

---

[5] In the same sense of the aforesaid, you can see Arvold, *Treasury Regulations and the Wilshire Oil Case*, 40 Colum. L. Rev. 252, 261 (1940).

it is retroactive. If, as in this case, the new ruling has the effect of correcting or improving a prior one in order to conform it more adequately to the statute, the retroactivity of the new ruling does not make it void or unlawful. *Manhattan General Equipment Co.* v. *Commissioner of Internal Revenue*, 297 U.S. 129 (1936). See also, *Samann* v. *C.I.R.*, 313 F.2d 461 (1963); *Slavenburg Corp.* v. *United States*, 207 F.Supp. 314 (1962); *Granquist* v. *Hackleman*, 264 F.2d 9 (1959); *Royer's Inc.* v. *United States*, 163 F.Supp. 225 (1958); *Functional Music, Inc.* v. *F.C.C.*, 274 F.2d 543 (1958); *Fed. Dep. Ins. Corp.* v. *Continental Ill. Nat. E. & T. Co.*, 245 F.2d 567 (1957); *United States* v. *Missouri Pac. R.R. Co.*, 278 U.S. 269 (1928); Griswold, *A Summary of the Regulations Problem*, 54 Harv. L. Rev. 398 (1941).[6] The second error assigned was not committed either.

The third assignment alleges that it was error "to decide that plaintiff-appellant's operations constituted an evasion from the payment of the excise taxes prescribed by statute." It is not necessary to discuss this question since, as the trial court concluded, on the basis of the evidence introduced said court was correct in determining that there is no doubt that the law authorized the manner of levying the excise announced by the Secretary to become effective as of November 1, 1961.

---

[6] Deciding in the above said sense, the Supreme Court of the United States, in *Manhattan Gen. Equip. Co.* v. *Commissioner of Int. Rev., supra,* stated at p. 135, as follows:

"The contention that the new regulation is retroactive is without merit. Since the original regulation could not be applied, the amended regulation in effect became the primary and controlling rule in respect of the situation presented. It pointed the way, for the first time, for correctly applying the antecedent statute to a situation which arose under the statute. [Citations omitted.] The statute defines the rights of the taxpayer and fixes a standard by which such rights are to be measured. The regulation constitutes only a step in the administrative process. It does not, and could not, alter the statute. It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand."

■ As we have seen, the amendment to the ruling was necessary. The previous language (price at which the importer sold) not only does not reflect properly the letter and intent of the law (price collected from the retailer) but it could give rise, as in fact it did, to engineering a fictitious taxable price. As we said before in *J. E. Candal & Co.* v. *Rivera*, 86 P.R.R. 481, 486 (1962), "To decide the contrary in this case would be to permit the use of the corporate fiction to evade compliance with legitimate obligations."[7] *Schenley Distillers Corp.* v. *United States*, 326 U.S. 432, 437 (1946); *South Porto Rico Sugar Corp.* v. *Sugar Board*, 88 P.R.R. 42 (1963) and authorities therein cited.

The judgment rendered by the Superior Court, San Juan Part, in this case, on September 14, 1965, will be affirmed.

---

[7] The stockholders of both corporations are:

*Licorería Trigo, Inc.*

| Stockholders | Shares |
|---|---|
| Juan Trigo-Orbeta | 100 |
| Benigno Trigo-Orbeta | 100 |
| Dionisio Trigo-Orbeta | 100 |

*Trigo Hnos., Inc.*

| | |
|---|---|
| Juan Trigo-Orbeta | 2,346-2/3 |
| Benigno Trigo-Orbeta | 2,346-2/3 |
| Dionisio Trigo-Orbeta | 2,346-2/3 |

Benigno Trigo-González and Dionisio Trigo-González have each 106-2/3 shares in Trigo Hnos., Inc., and although they do not have shares in Licorería Trigo, Inc., they are directors of both corporations. The remaining 736-2/3 shares of Trigo Hnos., Inc., are owned by six other persons all of the same Trigo family.