REUTERS LIMITED, Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee, Associated
Information Services Corp., Intervenor.

REUTERS LIMITED, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of Amer-
ica, Respondents, Associated Informa-
tion Services Corp., Intervenor.

Nos. 84–1567, 84–1568.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 31, 1985.
Decided Jan. 24, 1986.
As Amended Jan. 24 and March 13, 1986.

Kenneth E. Hardman, with whom John F. Noble, Washington, D.C., was on the brief, for appellant in No. 84–1567 and petitioner in No. 84–1568.

Roberta L. Cook, Counsel, F.C.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Catherine G. O'Sullivan and Edward T. Hand, Attys., Dept. of Justice, Washington, D.C., were on brief, for appellee in No. 84–1567 and respondents in No. 84–1568.

Paul J. Berman, with whom Jonathan D. Blake, Washington, D.C., was on brief, for intervenor in Nos. 84–1567 and 84–1568.

Before MIKVA and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

A precept which lies at the foundation of the modern administrative state is that agencies must abide by their rules and regulations. We have frequently been called upon to apply that venerable principle of law and common sense, and the appeal before us today fits squarely into that long line of cases. We hold that the Federal Communications Commission improperly breached this fundamental precept of administrative law in what turns out to have been a misguided effort to achieve a fair resolution of a dispute between two competing license applicants.

■ The warring contestants are Reuters Limited, who appeals from the FCC's adverse action,[1] and Associated Information Services Corporation, the successful intervenor. The regulatory prize in question consists of thirteen microwave radio station licenses which had officially been granted to Reuters but which, in the face of Associated's strenuous protests, were rescinded by the Commission.

The background of the dispute can be briefly stated. Following a lengthy period when its earlier applications lay dormant at the Commission, Reuters filed new applications, pursuant to the Commission's order, for microwave radio licenses for a single channel in each of thirteen cities across the Nation. The applications were duly accepted for filing and listed on a Public Notice dated August 12, 1983. In the following month, on September 23, 1983, the Commission's Private Radio Bureau approved all thirteen applications.

On that same day, as coincidence would have it, Associated submitted thirty-nine applications for each of the available channels in the same thirteen cities for which Reuters had applied the preceding month. Associated's applications, as it turned out, were misfiled, having been submitted to the Commission's offices in Washington, D.C., whereas applicable FCC rules required that such applications be filed 80 miles to the north at the FCC's offices in Gettysburg, Pennsylvania. Thus it was that Associated's competing applications were not effectively filed until five days later—on September 28, 1983—when its thirty-nine applications found their way to Gettysburg. *As a result, at the time of the grant to Reuters, no competing appli-*

---

1. Reuters has filed both a Petition for Review, under 47 U.S.C. § 402(a) (No. 84–1568), and a Notice of Appeal, under 47 U.S.C. § 402(b) (No. 84–1567). These provisions provide mutually exclusive avenues of judicial reviews. *Functional Music, Inc. v. FCC,* 274 F.2d 543, 547 (D.C.Cir. 1958), *cert. denied,* 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959). As the order under review effects a revocation of Reuters' validly granted licenses, it was properly appealed under section 402(b)(5), which provides for appeal of orders modifying or revoking a license. Case No. 84–1568 is, accordingly, dismissed. The FCC nonetheless protests by way of footnote the appealability of this order, arguing that it is not a "final order" and thus not reviewable under 28 U.S.C.

§ 2342(1). We disagree. "[F]inal orders are not limited to the last order issued in a proceeding, but to be final an order must 'impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process.'" *Bethesda-Chevy Chase Broadcasters, Inc. v. FCC,* 385 F.2d 967, 968 (D.C.Cir. 1967) (quoting *Chicago & Southern Air Lines v. Waterman Steamship Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948)); *see also Illinois Citizens Committee for Broadcasting v. FCC,* 515 F.2d 397, 402 (D.C.Cir.1975). Under this standard, this order is clearly reviewable for it denies Reuters a right by rescinding its previously granted licenses.

*cations had been effectively filed.* In due course, on October 12, 1983, the FCC mailed Reuters the thirteen licenses which bore the following words: "Effective Date—September 23, 1983."

With its competitor thus in possession of the thirteen licenses, Associated vehemently protested the grant. Associated contended that the Commission acted improperly in granting the licenses prior to the expiration of sixty days following the date on which new applications were accepted. In Associated's view, the Commission had represented quite clearly in a rulemaking proceeding that a full sixty-day period for filing applications would be allowed. Associated had specifically relied, it maintained, upon the Commission's statements to that effect in timing its thirty-nine applications. As Associated therefore saw it, the Private Radio Bureau had jumped the gun in issuing Reuters the thirteen licenses before the requisite sixty days had expired.

In stark contrast to this view, Reuters maintained that the Commission's rules governing microwave radio licenses expressly permitted licenses to be awarded after the expiration of *thirty days* following an application. At the time the Private Radio Bureau acted on Reuters' application, two critical factors were present: *first*, more than thirty days had expired from the initial date for accepting applications, as provided by the Commission's rules; and *second*, no competing applications were on file as of the date of the grant. In Reuters' view, therefore, Associated's complaints were belied by the Commission's express rules which spoke with crystalline clarity to the question at hand.

With the issue thus joined, the Private Radio Bureau resolved the dispute in favor of Associated. Rejecting outright Associated's broad contention that the Commission's rules and pronouncements did not admit of a license grant prior to expiration of the sixty-day period, the Bureau nonetheless concluded that Associated's applications were, in fact, mutually exclusive to those of Reuters inasmuch as the former's applications were on file in Gettysburg prior to the time the licenses were actually

issued by and mailed from the Commission. While thus rejecting the thrust of Associated's arguments, the Bureau set aside Reuters' thirteen licenses and designated Associated's applications as mutually exclusive.

Reuters appealed to the full Commission. Invoking the FCC's rules with respect to the effective dates of licenses, Reuters maintained that the Private Radio Bureau had expressly designated an effective date for the licenses of September 23, 1983, not the date of mailing. As it had before the Bureau, Reuters won the specific legal battles but lost the war. Specifically, the FCC agreed that the Bureau could lawfully issue a license any time after thirty days following the Commission's announced date on which applications would be received. So too, the Commission rejected Associated's argument that the FCC's more recent pronouncements in its rulemaking proceeding had altered the long-standing rules governing the timing of license grants. Reuters likewise won the point that the effective date of its licenses was September 23, 1983, as opposed to a date tied to the later mailing of the licenses by the FCC, and that Associated's applications were not effectively filed until they reached Gettysburg, five days after the effective date of Reuters' licenses.

But Reuters' arguments, tied in lawyerly fashion to the Commission's pertinent rules, in the end fell short. The Commission concluded that considerations of fairness required evisceration of the Reuters license grants and that Associated be permitted to stand alongside Reuters as a full competitor for these licenses.

Both to understand the Commission's rationale and to set the stage for our resolution of this appeal, we pause to enter the somewhat labyrinthine paths of the Commission's rules and pronouncements which guided these two contenders along rather different roads in the application process. It will be recalled that Reuters' applications lay dormant at the Commission for some considerable period prior to the events which generated the case at hand. The reason for this period of Commission in-action, it would appear, was regulatory

uncertainty over the uses to which microwave radio stations could properly be put. As we understand it, the Commission had for some time harbored rather restrictive views about such usages, but this regulatory narrowness was under assault from various quarters, including those anxious to employ such stations in the purveying of video entertainment programming, as opposed to the traditional use of these frequencies for point-to-point internal communications relating to the licensee's business. FCC Brief at 4. While the Commission was wrestling internally with these broad questions, Reuters' applications, filed initially in the early weeks of 1980, languished.

At length, the Commission came to rest in the rulemaking proceeding, identified as Docket No. 19671. The Commission's Memorandum Opinion and Order in that docket FCC No. 83-245, 48 Fed.Reg. 32578 (July 18, 1983), opened up these particular channels for point-to-*multipoint* systems, subject to a two-year period when only applicants seeking to provide data and other information-type services would be licensed in this particular part of the spectrum (2.5 GHz band). To carry out this new approach, the Commission returned all pending applications (including Reuters') and established a new filing period—to begin August 1, 1983—for applicants seeking to employ these channels for data or information distribution services.

In language which was destined to sow seeds of confusion, the rulemaking Memorandum Opinion and Order stated that the Commission would "strictly apply the cutoff procedures detailed in § 1.227(b)(4) of the Commission's Rules." 48 Fed.Reg. 32,-578, 32,584 (July 18, 1983).[2] This provision, as will be seen from its text as set forth in note 2, listed alternative dates for Commission action. In explaining its invocation of this provision, the Commission stated: "This means that there will be a new 60-day filing period opened up for competing applications for each of the three 2.5 GHz channels in each locale, commencing with the first such application which we accept for filing in each area." *Id.* The Memorandum Opinion and Order did not refer to the portion of its rules, Section 1.962(f),[3] governing applications for point-to-point microwave service (as opposed to point-to-multipoint service as involved here). And thus it came to be that Reuters invoked the latter procedure, which permits the Private Radio Bureau to award a license after a thirty-day period following issuance of public notice of the acceptance of an application for filing, whereas Associated relied upon the sixty-day period specified in the rulemaking opinion and order and in the then-applicable version of Section 1.227 (b)(4).

Faced with these divergent approaches, the Commission concluded that considerations of fairness warranted rescission of Reuters' licenses. While the award to Reuters was entirely in keeping with applicable rules,[4] the Commission determined that its

---

**2.** The cut-off rule states that:

In cases of applications filed in the Private Radio Services, except as otherwise provided in § 1.972, any application that is mutually exclusive with another application or applications will be consolidated for hearing with such other application or applications only if the later application in question is substantially complete and tendered for filing by whichever date is earlier: (i) Not later than the close of business 1 business day before the Commission adopted an order which first designated for hearing the prior application or applications with which such application is in conflict; or (ii) within 60 days after the date of public notice listing the first prior filed application (with which subsequent applications are in conflict) as having been accepted for filing.

47 C.F.R. § 1.227(b)(4) (1983).

47 C.F.R. § 1.227(b)(4)(1984).

**3.** This section provides that "[n]o application subject to the provisions of this section, as originally filed or substantially amended, will be granted by the Commission prior to the 31st day following the issuance of public notice of the acceptance for filing of such application." 47 C.F.R. § 1.962(f) (1984).

**4.** Although the language of both 47 C.F.R. § 1.962(a) and section 309 of the Communications Act specifically refers only to "fixed point-to-point" applications, the Commission held that it has long been Commission policy to construe the two provisions to include point-to-multipoint applications as well. Memorandum Opinion and Order, FCC 84-500, at 4 (Oct. 25, 1984);

own pronouncements had been misleading and could have led unsuspecting applicants to the erroneous view that no licenses would be granted prior to expiration of the sixty-day period. Consistent with this conclusion, the Commission on this appeal continues to admit to unfortunate draftsmanship in its rulemaking opinion:

> The Commission recognized ... that, notwithstanding its subjective intent not to guarantee to every applicant a full sixty-day filing period ... a contrary intent was inadvertently conveyed to potential applicants. The processing procedures that were intended to govern applicants in the 2.5 GHz band were ambiguous and, as a result, parties reasonably could have construed Section 1.227(b)(4) of the Commission's rules to allow a sixty-day filing period for mutually exclusive applications in the 2.5 GHz band.

FCC Brief at 16.

■ We are constrained to disagree with the Commission's understandable effort to achieve a just resolution of this unfortunate turn of events. The reason for our disagreement is simple but emphatic: the Commission properly granted licenses to Reuters pursuant to the express provisions of its rules. What is more, neither the Private Radio Bureau nor the Commission itself embraced the proposition that the Memorandum Opinion and Order was intended to alter the FCC's long-standing rules governing applications. That is not surprising, for the August public notice expressly stated that these filings were subject to the notice and petition procedures under section 309 of the Communications Act. 47 U.S.C. § 309 (1982).[5]

■ As we stated at the outset, it is elementary that an agency must adhere to its own rules and regulations. *Ad hoc* departures from those rules, even to achieve laudable aims, cannot be sanctioned, *Teleprompter Cable Systems v. FCC*, 543 F.2d 1379, 1387 (D.C.Cir.1976),

---

Private Radio Bureau letter opinion, No. 7310–17/373, at 2 (Feb. 14, 1984). The Commission long ago rejected the argument that such applications are not governed by the existing Commission rules. *In the Matter of Application Filed by Dow Chemical Company*, 19 Rad. Reg.2d (P & F) 430 (1970) (Memorandum Opinion and Order).

5. The FCC relies heavily on *Ridge Radio Corp. v. FCC*, 292 F.2d 770 (D.C.Cir.1961), for the proposition that the FCC may not refuse to consider an untimely application when the public notice of the deadline did not provide fair warning that the deadline applied to that applicant. *Ridge Radio*, however, is readily distinguishable from this instant case. The notice in *Ridge Radio* proclaimed that applications which were mutually exclusive to those listed had to file by a certain date in order to be considered for the license. Ridge Radio was not mutually exclusive of the listed application and thus to all appearances was not required to file. Ridge Radio was, however, mutually exclusive of an *unlisted* applicant which in turn was mutually exclusive of the listed applicant, an unfortunate "chain reaction" circumstance. Consequently, the FCC deemed Ridge Radio to be a mutually exclusive applicant which should have filed by the deadline. *Ridge Radio*, 292 F.2d at 772. The court found that, given that state of events, the notice was inadequate to inform Ridge Radio that it was subject to the deadline, and thus the late filing was excused, for it was entirely unreasonable for one to be held to notice of *unlisted* competitors. *Id.* at 773. The validity of the cut-off rules, identical to those employed here, was not questioned by the court. *Id.* The facts in this case stand in sharp contrast. Here, Associated does not deny that it knew from the August notice that the Reuters application was mutually exclusive, nor does it deny that the deadline was governed by published rules or regulations other than the notice itself.

In a submission filed January 14, 1986, counsel for Associated Information Services Corporation have argued that the recent decision of this court in *Salzer v. FCC*, 778 F.2d 869 (D.C. Cir.1985), is relevant to our analysis of the adequacy of notice of the cut-off period for the licenses at stake here. In *Salzer*, we upheld the Commission's authority to adopt a "letter-perfect" rule for LPTV applications. We stated that "the *quid pro quo* for stringent acceptability criteria is explicit notice of all application requirements.... The less forgiving the FCC's acceptability standard, the more precise its requirements must be." *Salzer*, at 875. In *Salzer*, we found that the FCC provided no notice at all of when and how the required information was to be provided. Here there was no such notice problem; the timing of the application and selection was and had always been governed by the Communications Act and longstanding regulations. *Salzer* also did not involve a revocation of a properly granted license; such a vested interest must be given due weight in any consideration of fundamental fairness.

for therein lie the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action. Simply stated, rules are rules, and fidelity to the rules which have been properly promulgated, consistent with applicable statutory requirements, is required of those to whom Congress has entrusted the regulatory missions of modern life.

Associated's invocation of well-settled principles of judicial deference to agency interpretations, Associated Brief at 3–6, is therefore quite beside the point. What is before us is not an agency interpretation of its own rules which Reuters is inviting us to override. Quite to the contrary. *The agency has authoritatively interpreted its rules in a manner which favors entirely Reuters' position.* What Associated would thus have us do, on analysis, is to permit the agency to deviate from its rules in order to achieve what it deems to be justice in the individual case. The agency has, in effect, said that its rules permitted the license awards granted to Reuters, but that the circumstances at hand warrant the Commission's walking away from the metes and bounds which otherwise constrain it. This we cannot sanction.

The remaining arguments advanced on appeal need not detain us. Succumbing wholesale to the temptation to indulge in the forbidden sin of *post hoc* rationalizations, the Commission invokes no lesser authority than the Supreme Court's venerable decision in *Ashbacker* to justify what occurred here. *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). In a murky line of argumentation, the FCC has now been moved to the position that the agency was required to rescind Reuters' duly issued licenses since Associated would otherwise be denied the *Ashbacker*-mandated right to a comparative hearing. It should have caused counsel some pause in this free-form flight of legal creativity that this bedrock principle never occurred to the Commission itself. We also note, by the by, that able counsel for Associated has not been inspired by the *Ashbacker* muse. Indeed, this appears not to have been some legal oversight by an overworked Commission, but rather a sadly misguided argument in the first instance. *Ashbacker*'s teaching applies not to prospective applicants, but *only to parties whose applications have been declared mutually exclusive.* That foundational requirement—mutually exclusive applications—is not met here; it could only be met by an inadmissable exercise of bootstrapping the "fairness" argument onto *Ashbacker's* holding to transform Associated, *nunc pro tunc* as it were, into a mutually exclusive applicant. This cannot be done, for as we have seen, the Commission had acted formally and officially in granting the licenses to Reuters before Associated's applications were on file in Gettysburg. To put it plainly, counsel's imaginative theory is decimated at the outset by the hard, cold fact that Associated was five days late in getting its applications on file. In short, as far as the well-established and vital rights conferred by *Ashbacker* are concerned, the horse left the barn on September 23, 1983, when the licenses were awarded to Reuters.

Associated, wisely, does not indulge in such unorthodox legal gymnastics as its imaginative Commission comrades; it invokes, more prudently, specific Commission precedent to seek to justify what has been done here. Specifically, Associated maintains that the Commission was within its lawful prerogative in rescinding the Reuters licenses because Associated filed a petition for reconsideration in timely fashion, in light of this court's decision in *Gardner v. F.C.C.,* 530 F.2d 1086 (D.C.Cir.1976).

At the outset, Associated's argument is fatally affected by our holding that the Commission was not at liberty to depart from its rules in the first instance. But what is more, the vehicle employed by Associated to secure the Commission's revisitation of Reuters' licenses was itself defective. The reason is that, under the express terms of the Communications Act, petitions for reconsideration must be filed "within thirty days from the date upon which public notice is given of the order,

decision, report, or action complained of." 47 U.S.C. § 405 (1982). The licenses in question were mailed to Reuters on October 12, 1983, and under the Commission's rules "public notice" occurs at 3 p.m. on the day after the document is mailed to affected persons, 47 C.F.R. § 1.4(b)(4) (1984); thus, in the case at hand, October 13, 1983 provides the applicable benchmark. That statutorily provided thirty-day period expired on November 14, 1983, which was prior to the date (November 16, 1983) on which Associated's petition for reconsideration was actually filed.

In response to Reuters' argument that the Commission was barred by express statutory limitations from acting on the petition for reconsideration, Associated invokes *Gardner* to justify its delay. There, this court found "extraordinary circumstances" under which "the seemingly mandatory language of Section 405 does not prevent the entertainment of rehearing petitions beyond the statutory period." 530 F.2d at 1091.

We are unpersuaded that *Gardner* can avail for Associated. There, the court took great pains in the clearest of language to limit its holding to the highly unusual circumstances presented there of the affected party's being situated in Alabama, unrepresented by counsel, and with the Commission failing to provide the customary notice to the party of its action. *See id.* at 1091–92 & n. 24. The *Gardner* court further emphasized that the party there, upon receiving by fortuitous circumstances informal notice of the Commission's action, immediately engaged counsel who very promptly filed the requisite petition. *Id.* at 1091. Without rehearsing in detail the facts of our case, involving a sophisticated business concern represented all the while by distinguished Washington, D.C. counsel, suffice it to say that we cannot in conscience cut *Gardner* from its express moorings. *See National Black Media Coalition v. FCC*, 760 F.2d 1297 (D.C.Cir. 1985) (construing 47 U.S.C. § 402(c) governing appellate jurisdiction). As a result, we conclude that the Commission acted beyond its lawful authority when it entertained the belated petition for reconsideration.[6]

We are therefore obligated to reject the various arguments proffered to buttress the Commission's action in this case. Under these circumstances, we hold that the Commission erred in rescinding Reuters' licenses and that the Commission is therefore bound by its previous, lawful grant. In sum, Reuters is entitled to its previously issued thirteen licenses.

*Judgment accordingly.*

---

6. The Commission suggests that this latter question be remanded in the first instance to the FCC. While ordinarily such a course might well be reasonable and prudent, that is not the case here. The facts are undisputed, the law is clear, and nothing would be served by further delay, especially in view of our conclusions that the licenses were lawfully granted to Reuters in the first instance and that considerations of fairness could not justify a departure from clear and applicable rules and regulations of the Commission.