**Rochelle C. SALZER, et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**GARNERLYNN COMMUNICATIONS, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee, Metromedia, Inc., Intervenor.**

**Nos. 84–1527, 85–1006.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 14, 1985.

Decided Dec. 13, 1985.

---

Robert S. Koppel, with whom David Tillotson and Aaron P. Shainis, Washington, D.C., were on brief, for appellants in No. 84–1527.

William M. Barnard, Washington, D.C., for appellant in No. 85–1006.

Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, David Silberman, John P. Greenspan and Barbara A. Kreisman, Counsel, F.C.C., Washington, D.C., were on brief, for appellee in No. 84–1527.

Gregory M. Christopher, Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief, for appellee in No. 85–1006.

David Tillotson, Robert S. Koppel, Alfred C. Cordon, Dennis J. Kelly, John R. Feore, Jr., Gary S. Smithwick, Harold K. McCombs, Jr., Washington, D.C., Stuart B. Mitchell, Andrew Bisulca, Falls Church, Va., James L. Oyster, Arlington, Va., Harry C. Martin, Matthew H. McCormick, Tom W. Davidson, James L. McHugh, Jr., Raul R. Tapia, William H. Crispin and Peter Tannenwald, Washington, D.C., were on joint brief for amici curiae, Southeastern Michigan Broadcasting, Inc., et al., in No. 84–1527, urging reversal.

Thomas J. Dougherty, Preston R. Padden and Gene P. Belardi, Washington, D.C., entered appearances for intervenor, Metromedia, Inc. in No. 85–1006.

Before WRIGHT and EDWARDS, Circuit Judges, and DAVIS,[*] Circuit Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge.

In these cases, appellants Garnerlynn Communications ("Garnerlynn") and Rochelle C. Salzer[1] ("Salzer") each appeal from an order of the Federal Communications Commission ("FCC" or "Commission") rejecting its application to construct and operate a low power television ("LPTV")[2] station.

Appellant Garnerlynn applied for a license to operate a LPTV broadcast facility on channel 5 in Cape May, New Jersey. After the submission of the Garnerlynn application, the FCC completed a comprehensive LPTV rulemaking. It adopted a stringent "complete and sufficient"[3] standard governing the acceptability of LPTV applications for processing, and required that pending applications be amended to conform with the Commission's new rules. Although one of the new LPTV regulations required applicants intending to operate with frequency offset to indicate the specific type of offset proposed on the face of the application, Garnerlynn did not amend its application to conform to this requirement. Its application was therefore rejected pursuant to the "complete and sufficient" standard because, without the use of frequency offset, its operation would create objectionable interference with WNEW, channel 5 in New York.

Appellant Salzer sought the license to operate a LPTV broadcast facility on channel 7 in Honolulu, Hawaii. She submitted her application after the FCC had completed a second LPTV rulemaking, promulgating regulations to enact a lottery system for the selection of LPTV licensees and affirming its commitment to the "complete and sufficient" standard for LPTV applications. These new regulations require applicants to certify that they possess certain legal qualifications for LPTV licensing and to provide supplementary information necessary to determine their entitlement to preferences awarded in the lottery proceeding. The Salzer application, too, was rejected in light of the "complete and sufficient" standard, because she failed to make the required certifications and to provide the necessary preference information.

Appellants Garnerlynn and Salzer assert that the FCC was not authorized to adopt the stringent "complete and sufficient" standard of acceptability. In addition, they contend that the agency failed to provide sufficient notice of the specific LPTV filing requirements relevant to the deficiencies in their applications.

We hold that, under the circumstances, the FCC was clearly entitled to adopt a strict acceptability standard for LPTV applications. Given the expected deluge of LPTV applications and the limited nature of administrative resources, it was entirely reasonable for the agency to require applications to conform precisely to all processing requirements. However, fundamental fairness also requires that an exacting application standard, enforced by the severe sanction of dismissal without consideration on the merits, be accompanied by full and

---

[*] Sitting by designation pursuant to 28 U.S.C. § 291(a).

**1.** Appellants in *Rochelle C. Salzer, et al. v. FCC* are forty-four individual applicants for the permit to construct and operate low power television channel 7 in Honolulu, Hawaii. For convenience, we will refer to this group of appellants as Salzer throughout the opinion.

**2.** LPTV is the "low power broadcasting of original programming, rather than low power rebroadcasting of full service television programs

received off the air." *Neighborhood TV Co., Inc. v. FCC,* 742 F.2d 629, 631 (D.C.Cir.1984).

**3.** *See* 47 C.F.R. § 73.3564(a) (1984). In *Citizen's Television Corp.,* 58 Rad.Reg.2d (P & F) 698, 700 (1985), the Commission asserts that its "complete and sufficient" standard requires applications to be "letter perfect when tendered." The use of either phrase appears to signify that no omission or improper presentation of required information will be tolerated, and we will employ them interchangeably.

explicit notice of all prerequisites for such consideration. We hold that Salzer did not receive adequate notice of when and how pending LPTV applications were to be amended to include the required supplementary information. We therefore vacate the FCC's order dismissing Salzer's application, and remand the matter to the agency for the reinstatement of that application *nunc pro tunc.* Garnerlynn, on the other hand, provides an excellent illustration of the entirely justified application of the stringent acceptability standard in a case where the notice provided by the FCC was unequivocal; and we therefore affirm the FCC's order dismissing Garnerlynn's application.

### I. THE FCC's AUTHORITY TO ADOPT THE "COMPLETE AND SUFFICIENT" STANDARD

#### A. *Background*

Prior to 1982, stations operating at low power were permitted only to retransmit the signals of high power stations. In 1982, however, the FCC created a new service and authorized LPTV licensees to originate their own programming.[4] Low power licensees are now permitted to broadcast in the gaps between the transmission ranges of existing high power stations. Instead of listing all potential licenses and soliciting applications for discrete areas, the FCC requires LPTV applicants to specify the location and frequency of their proposed signals. Any LPTV application creating interference with a high power station is immediately dismissed.[5] LPTV proposals

that the FCC predicts to produce interference with each other are deemed mutually exclusive, and a lottery is conducted to determine which of the applications will be granted.[6]

In the course of its LPTV rulemaking, the Commission also announced its departure from the acceptability standard generally applicable to broadcast applications— the "substantially complete" standard [7]—and its adoption of the new, stringent "complete and sufficient" standard.[8] In so doing, the Commission relied on a statement made by this court in *Radio Athens, Inc. (WATH) v. FCC.*[9] In that case, this circuit contrasted the "public interest in assuring that the limited remaining broadcast facilities go to the best qualified applicant" and the FCC's interest in "procedures and administrative techniques that enable the Commission to handle its work load efficiently, and with optimum use of limited administrative resources," and suggested: "[p]erhaps the Commission can accommodate the various interests by adopting administrative expedients that, for example, explicitly require all applications to be letter-perfect when filed."[10]

The Commission formally accepted this implicit invitation in its *LPTV Report and Order.* Explicit reasons were given for the departure from the old "substantially complete" standard, and the consequences of non-compliance were fully explained:

> The Commission's limited resources and the large number of low power applications to be processed simply will not per-

**4.** *Report and Order in the Matter of an Inquiry into the Future Role of Low Power Television Broadcasting and Television Translators in the National Telecommunications System,* 47 Fed. Reg. 21,468 (1982), *on reconsideration,* 48 Fed. Reg. 21,478 (1983) (hereinafter *LPTV Report and Order* ).

**5.** *See* 47 C.F.R. § 74.705(b) (1984). Full power stations are entitled to protection from interference by any LPTV proposal.

**6.** *See* 47 U.S.C. § 309(i) (1982) (*implemented in Selection From Among Certain Competing Applications Using Random Selection or Lotteries Instead of Comparative Hearings,* 48 Fed.Reg. 27,-182 (1983), *on reconsideration,* 49 Fed.Reg. 49,-

466 (1984) (hereinafter *Lottery Report and Order* )).

**7.** *See James River Broadcasting Corp. v. FCC,* 399 F.2d 581 (D.C.Cir.1968). Under the *James River* standard, the FCC must accept applications that are substantially complete when filed even if they contain minor errors or infractions of agency rules, so long as any such defects may be cured without injury to public or private interest.

**8.** *LPTV Report and Order,* 47 Fed.Reg. at 21,481.

**9.** 401 F.2d 398 (D.C.Cir.1968).

**10.** *Id.* at 401.

mit the staff to coach applicants in correcting defects or omissions in applications that have been filed, as sometimes has been the case in the past. Defective low power applications will be returned summarily, and if they are resubmitted with perfecting amendments, they will be placed at the end of the processing line, unless passage of a cut-off date precludes consideration altogether, in which case the resubmission will be returned.[11] The LPTV rulemaking afforded all applicants full notice of the Commission's new fault-free approach and gave cogent reasons for its adoption of a stringent standard.

### B. *Analysis*

Both Garnerlynn and Salzer contend that the Commission's adoption of the "complete and sufficient" standard was arbitrary and capricious,[12] arguing that the unprecedented institution of such draconian measures is impermissible. We disagree.

In adopting the lottery statute that governs the processing of LPTV applications,[13] Congress stated that it expected the FCC to employ the traditional "substantially complete" standard *unless* the agency adopted another standard by rule.[14] As a result, the Commission, well aware of its limited resources and expecting a flood of applications,[15] duly enacted the more exacting application standard.

This decision was a reasonable exercise of discretion. Each LPTV application must be screened for objectionable interference with high power stations and with other mutually exclusive low power proposals.

The Commission has implemented a computer program that identifies overlaps between the protected transmission ranges of existing and proposed stations and categorizes unacceptable and mutually exclusive applications. Each application directly and indirectly affects numerous others; thus the correction of an application that modifies its engineering data or the reinstatement of a formerly excluded application may require additional computer analysis and delay the processing of all interconnected applications, not simply the one amended. The FCC refers to this circumstance as the "daisy-chain" phenomenon.

The combined effect of limited agency resources, an overwhelming number of applications and the "daisy-chain" phenomenon[16] clearly justified the adoption of a letter-perfect application standard. Moreover, as noted above, this court had suggested that the Commission might properly do so if explicit notice were given of the new acceptability standard.[17] Neither applicant here asserts that the FCC failed to provide sufficient notice. It is well known that agencies have wide latitude to establish their own procedures,[18] and it cannot be found that the adoption of this rule was either contrary to law or otherwise unreasonable. Accordingly, we reject appellants' argument that the Commission was without authority to enact a letter-perfect standard.

### II. The Salzer Application

### A. *Background*

In the Communications Amendments Act of 1982, Congress authorized the FCC to

---

**11.** *LPTV Report and Order,* 47 Fed.Reg. at 21,-481.

**12.** *See* 5 U.S.C. § 706(2)(A) (1982).

**13.** *See* 47 U.S.C. § 309(i) (1982).

**14.** H.R.Rep. No. 765, 97th Cong., 2d Sess. 39 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2237, 2283.

**15.** In fact, the Commission had received 30,000 applications by October, 1984. *Low Power Television Service (Filing Window),* 57 Rad.Reg.2d (P & F) 234, 239 n.6 (1984).

**16.** Although applications that fail to provide non-technical information, such as minority preference data, may be processed without implication of the "daisy-chain" phenomenon, we hold that, under the circumstances, the Commission had the authority to apply the letter-perfect standard to all application requirements.

**17.** *Radio Athens, Inc. (WATH) v. FCC,* 401 F.2d at 401.

**18.** *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978).

utilize a system of random selection, a lottery, to select licensees in certain broadcast services. Noting the overwhelming backlog of LPTV applications, Congress expressly stated its desire that LPTV licensees be chosen by lottery.[19]

The legislature also specified a system of preferences [20] intended to promote diversity of ownership in mass communications media. In addition to the information necessary to assign preferences, the Commission decided to obtain two further certifications from applicants prior to permitting their participation in the lottery. Each prospective licensee is required to certify that she is the real party in interest with reference to that proposal, and that she has not submitted multiple mutually exclusive applications in order to obtain an advantage in the lottery proceeding.

On March 31, 1983, the FCC adopted rules to implement the lottery statute for the LPTV service, including provisions for the preference system and the required certifications. This order reaffirmed the Commission's selection of the "complete and sufficient" standard, and explained the impact of the new lottery-related requirements on the LPTV application form:

> 51. *LPTV Application Form.* The preference system being adopted in this *Report and Order* requires the submission of additional information on ownership characteristics and various other certifications by those who have already filed LPTV applications. Form 346, the application for LPTV construction permits is being amended to reflect the new information requirements. *See* Appendix D ... *New mutually exclusive applications ... will be required to conform with all rules and policies in effect, as reflected in the new form.*[21]

The *Lottery Report and Order* summarized the contents of the forthcoming version of form 346 in Appendix D, and stated that a draft copy of the revised form was available for inspection at the FCC Dockets Branch in Washington, D.C. or, for a fee, through a private copy center.[22] The revised application form, the new requirements and a supplementary form that could be used to amend pending LPTV applications were also published by the FCC in mimeo form on August 19, 1983.[23] This mimeo provides helpful information, but the FCC concedes that it does not constitute official notice.

Revised form 346 was not available to LPTV applicants during the time period relevant to this case. Nonetheless, LPTV applicants were required to provide all supplementary information to the Commission after the publication of the *Lottery Report and Order.* Appellant Salzer failed to supply the required preference and certification information, either by utilizing the unofficially suggested supplementary form or by attempting to glean the new requirements from the *Lottery Report and Order* and devise her own submission. Her application was therefore dismissed.

### B. *Analysis*

■ On September 13, 1983, the FCC published a cut-off list for channel 7 in Honolulu, giving potential applicants thirty days to file competing proposals. On October 13, 1983, the cut-off date, the proposals of Salzer and the other forty-three appellants were filed. The applications were

---

**19.** H.R.Rep. No. 765, *supra* note 14, at 38–39, U.S.Code Cong. & Admin.News 1982, at 2282, 2283.

**20.** A preference in the random selection context may be analogized to the receipt of additional lottery tickets. Applicants controlled by minority group members or applicants with no controlling interest in any other mass communications media entity each receive a relative preference of 2:1. An applicant with a controlling interest in fewer than four such entities obtains only a 1.5:1 preference.

**21.** *Lottery Report and Order,* 48 Fed.Reg. at 27,-189 (emphasis supplied).

**22.** *Id.* at 27,200.

**23.** *Required Supplement to Low Power Television/Television Translator Construction Permit,* Mimeo No. 6030 (Aug. 19, 1983), *reprinted in* Joint Appendix ("J.A.") 58.

returned by the FCC staff as unacceptable under the "complete and sufficient" standard for filing because they lacked the preference information and certifications discussed above. Salzer contends that the LPTV rulemaking did not provide clear notice of the FCC's amendment requirements in this regard. Although we believe that Salzer had adequate notice of what information had to be filed, we hold that the Commission was impermissibly vague with respect to when the new submissions were required and what form they had to take.

Official notice of the revision of form 346 was clearly provided. The Commission's new informational requirements were adequately described and explained in Appendix D and in several individual paragraphs of the *Lottery Report and Order*.[24] Unfortunately, however, the unavailability of a revised version of form 346 and the ambiguous language of the *Lottery Report and Order* combined to mislead applicants with regard to the necessary timing and form of the required submissions. For example, one clearly reasonable interpretation of the Commission's pronouncement that new applicants would be required "to conform with all rules and policies in effect, as reflected in the new form" was that applicants would have to file on the new form only when it subsequently became available. Second, official notice of the existence of a supplemental form was never given. The FCC asserts that applicants could have engaged in self-help and made the required submissions in any form; however, the unofficial mimeo issued by the FCC appears to mandate the use of the FCC's supplementary form.[25]

Our finding that the official pronouncements of the FCC were deficient vis-a-vis the timing and form of the necessary submissions is supported by the facts of this case. Of fifty-three applicants for channel 7, forty-four, the appellants in *Salzer*, failed to file the required supplement. The remaining nine filed the supplementary form provided by the FCC; none submitted a home-made form. Even agency counsel speculated at oral argument that those applicants who filed properly had done so because they had seen the *unofficial* notice. These circumstances are further evidence that the *Lottery Report and Order* left applicants confused as to how and when to provide the newly required information.

■ As this court has previously stated, the *quid pro quo* for stringent acceptability criteria is explicit notice of all application requirements: "[w]hen the sanction is as drastic as dismissal without any consideration whatever of the merits, elementary fairness compels clarity in the notice of the material required as a condition for consideration."[26] The less forgiving the FCC's acceptability standard, the more precise its requirements must be. The FCC cannot reasonably expect applications to be letter-perfect when, as here, its instructions for those applications are incomplete, ambiguous or improperly promulgated. The agency failed to give adequate notice as to how and when the preference information and the real party in interest and multiple application certifications should be submitted. Thus, it was not entitled to reject the applications of Salzer and her forty-four co-appellants on the ground that they failed to include these submissions.[27] Therefore, we

---

24. *See Lottery Report and Order,* 48 Fed.Reg. at 27,189.

25. The mimeo stated: "Until the new edition of the form is available applicants are required to file the attached supplement with the September 1982 edition of FCC Form 346." J.A. 58. The attached supplement is the FCC's supplementary form.

26. *Radio Athens, Inc. (WATH) v. FCC,* 401 F.2d at 404. *See also Bamford v. FCC,* 535 F.2d 78, 82 (D.C.Cir.) ("elementary fairness requires clar-

ity of standards sufficient to apprise an applicant of what is expected"), *cert. denied,* 429 U.S. 895, 97 S.Ct. 255, 50 L.Ed.2d 178 (1976).

27. Although we hereby vacate the FCC's order dismissing the Salzer application, we explicitly disclaim reliance on two arguments made by appellant. First, we do not rely on the fortuity that appellants filed their applications without the assistance of counsel; the FCC need not take this circumstance into consideration. Second, we reject Salzer's argument that, because the supplementary form was mailed to applicants

vacate the FCC's order dismissing these applications and remand this case to the agency for their reinstatement *nunc pro tunc.*

### III.  THE GARNERLYNN APPLICATION

#### A.  *Background*

In the *LPTV Report and Order,* the Commission announced that applicants with proposals pending would be afforded ninety days to amend their applications in order to bring them into compliance with the final LPTV rules.[28]  One specific item of engineering data required for the first time in the new LPTV regulations was a frequency offset specification.  Frequency offset operation permits a greater number of stations to occupy the same channel without destructive interference.  An assigned frequency band or channel may be divided, and broadcasters may operate exclusively within the upper portion ("plus offset"), the middle portion ("zero offset"), or the lower portion ("minus offset"), of the band, or, alternatively, without any offset at all.  Thus, a LPTV applicant, such as Garnerlynn, proposing to use a channel already occupied by a full power television station, may do so only if the full power licensee is operating with frequency offset and if the LPTV applicant specifies its selection of a different type of frequency offset.

In the *LPTV Report and Order,* the Commission noted a new requirement for applicants desiring to employ frequency offset: "If an applicant proposes offset operation, an offset must be specified."[29] The possible types of offset (plus, minus, zero) were enumerated in the same paragraph.[30]

with LPTV proposals pending, the FCC unfairly treated pre- and post-rulemaking LPTV applicants differently.  These applicants were not similarly situated, and the FCC provided a rational explanation for their disparate treatment.

**28.** *LPTV Report and Order,* 47 Fed.Reg. at 21,-481, 21,482.

**29.** *Id.* at 21,477.

On June 23, 1982, the Commission issued a Public Notice, directing applicants who had already filed to amend their applications within ninety days.[31]  The notice contained a guide for the amendment of LPTV applications and answers to the most frequently asked questions relating to the recent *Report and Order.*  Specific reference was made to the offset specification requirement:

> Frequency Offset.  Since the application form (FCC Form 346) does not elicit frequency offset information, any applicant proposing offset must so indicate by specifying "zero," "plus" or "minus" offset in the amendment.[32]

Although Garnerlynn stated in its engineering statement that it proposed to operate with frequency offset, nowhere in its proposal did it specify which type it would utilize.  This case turns on whether Garnerlynn had adequate notice that it had to amend its application to specify frequency offset.

#### B.  *Analysis*

The *LPTV Report and Order* was properly published in the *Federal Register.*  It is the FCC's principal statement regarding LPTV licenses.  Any applicant, or other party with an interest in a LPTV license, should have read it carefully and been alerted to the forthcoming amendment period.  In fact, Garnerlynn does not contend that it was not aware of the rulemaking and subsequent public notice.  Instead, Garnerlynn attempts to characterize the amendment notice as "obscure and hypertechnical,"[33] and further contends that its unamended application met the FCC's requirements.

**30.** The specification requirement was codified at 47 C.F.R. § 74.705(d)(1)(i) (1984).

**31.** *Low Power Television Service (Amendment Period),* 51 RAD.REG.2d (P & F) 1275 (1982).

**32.** *Id.* at 1276.  An illustration was also set out in the "Application Amendment Guide," *see id.* at 1277–78.

**33.** Brief for Appellant Garnerlynn at 21.

Garnerlynn is mistaken on both counts. First, we fail to see how the above-cited language of the public notice could be misunderstood.[34] Second, although Garnerlynn did note on the third page of its engineering statement that it proposed to use frequency offset, the type of offset to be utilized was mentioned neither on the face of the application nor in the engineering statement. The requirement is clear; applicants must specify the *type* of offset they propose to use on the application form.

Garnerlynn contends that the FCC should have deduced the type of offset proposed from its application.[35] However, it is not the agency's task to select for an applicant the type of operation that will minimize impermissible interference. We hold that the FCC gave notice to LPTV applicants that it would not perform this sort of a deduction; the burden was therefore on the LPTV applicant to submit a proposal acceptable to the FCC. Moreover, Garnerlynn's omission had a substantive effect on the FCC's ability to process the application. Absent the specification of zero offset, the Garnerlynn proposal was predicted to create unacceptable interference with the operation of a high power television station.

It is well-settled that to be entitled to consideration with other mutually acceptable applications, a proposal must meet the FCC's criteria of acceptability by the cut-off date established.[36] The Public Notice of the Amendment Period clearly required the specification of frequency offset. The agency staff's computer operators fed the unamended application's data into the LPTV program and predicted disqualifying interference with channel 5 in New York. Where, as here, the notice provided was so patently clear, the FCC was entirely justified in enforcing strict compliance with its amendment requirements in order to expedite the processing of literally thousands of LPTV applications.

IV. CONCLUSION

We hold that the FCC is entitled to impose rigid and stringent acceptability criteria upon LPTV applications. The more exacting the standard, however, the greater the Commission's obligation to be explicit about any prerequisites for consideration. The FCC fulfilled this responsibility to the applicant in *Garnerlynn;* accordingly, we hold that the Commission's rejection of the Garnerlynn application was reasonable and affirm that order. The appellants in *Salzer,* however, were not provided with notice sufficient to satisfy the requirements of the Administrative Procedure Act. The FCC's dismissal of their applications was therefore arbitrary and capricious, and that order must be vacated and remanded for the reinstatement of the applications *nunc pro tunc.*

*So ordered.*

**34.** Garnerlynn strains the limits of the language in the Public Notice to argue that a misunderstanding was possible. The FCC required amendments of two types: "amendments of technical and non-technical information required to render the application complete and accurate" and "amendments filed to bring the application into compliance with the technical and engineering standards of the rules." 51 RAD.REG.2d (P & F) at 1275. Even assuming, as Garnerlynn argues, that its application was in compliance with technical and engineering standards because it actually proposed offset in its engineering statement, the specification of frequency offset on the face of the application was clearly contemplated to "render the application complete and accurate." This requirement is made manifest by the portion of the instructions cited above.

**35.** Garnerlynn's application demonstrates its recognition that channel 5 in Washington, D.C. (WTTG) and channel 5 in New York, N.Y. (WNEW) required protection. The television table of assignments, 47 C.F.R. § 73.606(b) (1984), includes all channel assignments and specifies the use of any type of frequency offset. Channel 5 in New York operates with a plus offset, while channel 5 in Washington, D.C. employs a minus offset. Thus, one might deduce that Garnerlynn proposed to utilize a zero offset.

**36.** *See Ranger v. FCC,* 294 F.2d 240, 244 (D.C. Cir.1961).