## V.

MALKAN FM ASSOCIATES, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION

Rio Bravo Broadcasters, Intervenor.

TREY BROADCAST COMMUNICATIONS, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION

Hamon Broadcasting Corporation, Intervenor.

Nos. 90–1281, 90–1282.

United States Court of Appeals, District of Columbia Circuit.

Argued May 7, 1991.

Decided June 14, 1991.

1314

Harry F. Cole, Washington, D.C., for appellant Malkan FM Associates in No. 90–1281.

Barry J. Fleishman, for appellant Trey Broadcast Communications, Inc., in No. 90–1282. Karen L. Bush, Washington, D.C., also entered an appearance for appellant.

Roberta L. Cook, Counsel, F.C.C., with whom Robert L. Pettit, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, were on the brief, Washington, D.C., for appellee in No. 90–1281 and No. 90–1282.

Howard M. Weiss, Washington, D.C., and Lauren A. Colby, Frederick, Md., were on the joint brief for amici curiae G. Dale Cowle and Pike Family Broadcasting, Inc., in No. 90–1281 and No. 90–1282.

Bruce A. Eisen, Washington, D.C., was on the brief for intervenor, Rio Bravo Broadcasters, Ltd., in No. 90–1281.

Before RUTH BADER GINSBURG, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

Dissenting opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

RUTH BADER GINSBURG, Circuit Judge:

The Federal Communications Commission ("FCC" or "Commission"), under its exacting "hard look" procedures for processing FM applications, summarily rejected each of the two commercial FM radio station construction applications at issue in these consolidated cases. In both cases, the Commission dismissed the applications, as unacceptable for filing, because the antenna heights for the proposed stations exceeded the ceiling set by international

agreement. The unsuccessful applicants, now appellants Malkan FM Associates and Trey Broadcast Communications, Inc., assert that the FCC's summary dismissals of their applications, without leave to file corrective amendments, should be set aside as arbitrary, capricious, and fundamentally unfair.

We conclude that the FCC gave adequate notice that FM applications would be found "acceptable" for filing only if they fully complied with the Commission's technical rules, including antenna height limits set by international agreements. We therefore affirm the Commission's final order rejecting appellants' applications.

## I.

On July 12, 1985, Malkan FM Associates [1] filed with the FCC an application to construct a Class A commercial FM station in South Padre Island, Texas; Malkan's application proposed an antenna with a height above average terrain ("HAAT") of 100 meters, or 328 feet. On September 18, 1986, Trey Broadcast Communications, Inc., applied for a construction permit for a Class A commercial FM station in Beeville, Texas; Trey's application proposed an antenna with an HAAT of 304.4 feet. In both cases, the Commission received a number of other timely applications for the stations in question:

Both Malkan's and Trey's proposed station sites are within 320 kilometers of the border separating the United States from Mexico. Both applications, therefore, fall within the territory covered by a 1972 agreement between the United States and Mexico in which the two countries agreed to minimize radio interference at the border by, inter alia, limiting antenna heights for Class A FM stations to 300 feet. *See* Agreement on Radio Broadcasting in the Standard Broadcast Band, Nov. 9, 1972, United States–Mexico, art. 5, § A(6)(a), 24 U.S.T. 1815, 1830, T.I.A.S. No. 7697, at 16 ("U.S.–Mexico Agreement").[2] Because Malkan and Trey had proposed antenna heights above the limit set by the U.S.–Mexico agreement, the Commission found their applications "unacceptable." Citing its new system for processing FM applications, promulgated as a final rule in May 1985, the Commission denied Malkan and Trey leave to amend their applications nunc pro tunc to meet the antenna height ceiling stated in the U.S.–Mexico Agreement.

### A. The Commission's 1985 "Hard Look" Application–Processing Regime

The FCC, in 1985, faced the influx of thousands of commercial FM applications for over 650 new allotments for FM facilities. Prompted by the anticipated swell in applications, the Commission that year adopted procedures intended "to expedite service to the public and to provide increased certainty and efficiency in the applications processing system." *Processing of FM and TV Broadcast Applications, Report & Order*, 50 Fed.Reg. 19,936, 19,-936 (May 13, 1985) ("1985 FM Rules"). Under the 1985 FM Rules, the Commission announces a fixed filing period, or "window," during which candidates may submit construction applications for available channels. Mutually exclusive applications filed during a window are subject to comparative hearings to determine the best applicant. If no satisfactory application is filed during the window period, the channel is granted to the first qualified applicant to file. *See id.* (codified at 47 C.F.R. § 73.3564 (1990)).

---

1. Malkan's application was originally filed in the name of Texas Media Group, Inc.

2. At the time the U.S.–Mexico Agreement was signed, the HAAT restriction for all Class A FM stations in the United States was 300 feet. In 1983, however, the Commission switched to a metric standard and, in the process, raised the maximum height for Class A FM stations to 328 feet (100 meters). *See Radio Broadcast Services; Modification of FM Broadcast Station Rules to Increase the Availability of Commercial FM Broadcast Assignments, Report and Order*, 48 Fed.Reg. 29,486, 29,498 (1983). After metrication, the Commission amended its power and antenna height requirements to reflect the new maximum antenna height, *see* 47 C.F.R. § 73.211, but failed to mention in that regulatory prescription that stations within 320 kilometers of the U.S.–Mexico border remained subject to the 300–foot limit set forth in the 1972 agreement.

As a component of its new "hard look" approach, the Commission instituted a stringent "tender review" of applications. *See* 50 Fed.Reg. at 19,940. Applications not "substantially complete" when filed will be returned by the Commission as not "tenderable." *See id.* Applications found tenderable are placed on a publicly-released "Notice of Tenderability." *See id.* at 19,-941. Within the 30 days immediately following release of this notice, applicants may "amend or perfect their applications at will and as a matter of right." *Id.*

After the 30–day amendment-at-will period, the Commission closely checks the applications for "acceptability," which the Commission defines as "compliance with the technical requirements for FM facilities." *See id.* If the application is found unacceptable, the FCC will return it. "Resubmission of such an application with a curative amendment," the Commission announced, "will not gain it *nunc pro tunc* status since applicants were afforded 30 days after the release of the *Notice of Tenderability* to amend their applications into acceptable form." *Id.* "To permit curative amendments after that period," the Commission stated, "poses too great a threat to the orderly functioning of [the] new processing procedures." *Id.* Once an application is found acceptable, on the other hand, "it is placed on a publicly-released 'Notice of Acceptability' inviting the filing of petitions to deny." *Id.*

Accompanying the publication of the Commission's new rules in the Federal Register was an explanatory appendix entitled "Statement of New Policy Regarding Commercial FM Applications That Are Not Substantially Complete or Are Otherwise Defective." *See id.* at 19,945 (Appendix D). The Appendix states:

> 4. Compliance with the Commission's technical rules is evaluated in the course of an acceptability study.... The absence of one or more elements of those data, listed below, prevents a determination of acceptability and thus renders the application not substantially complete.

> .  .  .  .  .

> (e).... Antenna height is as elemental a facility parameter as is ERP [Effective Radiated Power]. It also is subject to permissible-range values as a function of station class and, with ERP, determines the coverage area of a facility for a given signal strength. Antenna height is also limited in certain cases by international treaty or by allocation constraints.

*Id.* at 19,945–46.

Appendix D further notes that if the Commission accepts an application for filing but subsequently finds it not to be "grantable," the applicant will be given an opportunity to amend, as long as its application is not mutually exclusive with other applicants. *See id.* at 19,946. If an "acceptable but not grantable" application is mutually exclusive, the Commission will specify an appropriate issue in the Hearing Designation Order or allow a post-designation amendment. *See id.*

## B. *Malkan's and Trey's Applications*

Malkan filed its application for a construction permit in July 1985, three months after the FCC's new application-processing system went into effect. Malkan's application specified a 328–foot (100–meter) antenna height. In December 1985, the Commission issued a one-page notice, in mimeographed form, headlined: "Commission Reaffirms That the U.S.–Mexican Agreement of 1972 is Still in Effect." *See Public Notice*, Mimeo No. 1634 (December 23, 1985), *reprinted in* Joint Appendix ("J.A.") at 28. The notice explained that, although the metrication process had raised the maximum antenna height for FM stations that operate domestically, *see supra* note 2, "FM stations within 320 kilometers of the United States–Mexican border area must still comply with the bilateral Agreement." The penultimate paragraph of the notice stated:

> ... [I]f you are applying for a Class A FM station within 320 kilometers of the U.S.–Mexican border, the maximum parameters you may request are 3 kilowatts at an antenna height above average terrain (HAAT) of *91* meters. You may <u>NOT</u> request 3 kilowatts at an

HAAT of 100 meters; if you do, your application will be returned as unacceptable for violating the United States–Mexican FM Agreement.

*Id.* (emphasis in original).

Cued by the notice, Malkan attempted to file a corrective amendment to its application on January 14, 1986. By that date, however, the 30–day post-tender amendment-at-will period had long passed. On March 24, 1986, without mentioning the attempted amendment, the Commission rejected Malkan's application as unacceptable because the antenna height proposed was not in accord with the U.S.–Mexico Agreement.

Trey filed its application for a construction permit in September 1986, specifying an antenna height of 304.4 feet. On March 16, 1987, the Commission rejected Trey's application as unacceptable for exceeding the height limit set by the U.S.–Mexico Agreement.

The Chief of the FCC's Audio Services Division upheld the summary rejection of Malkan's application in a Hearing Designation Order, *In re Applications of Susan Lundborg, et al.,* 3 FCC Rcd 1 (Audio Services Division 1988). He also upheld the summary rejection of Trey's application. *See* Letter to Trey Broadcast Communications, Inc. (May 13, 1988), *reprinted in* J.A. at 14. In rejecting petitions by Malkan and Trey for reconsideration, the Chief referred to an intervening decision, *Kerrville Radio,* 2 FCC Rcd 3441 (1987), in which the Commission held that the 1985 FM Rules had provided sufficient notice that failure to comply with the U.S.–Mexico Agreement would result in return of applications as unacceptable for filing.

On review before the Commission, Malkan argued that compliance with international agreements was not a criterion for "acceptability," which permits no amendment, but rather for "grantability," which does. As support for its position, Malkan produced the videotape of a Commission-sponsored seminar held on April 30, 1985—

shortly before the May 13 publication of the new rules—to familiarize the public with the forthcoming alteration of FM filing procedures. In the course of the seminar, an official in the FCC's Mass Media Bureau discussed the "legal and other final studies" that the Commission undertakes to determine if an application is "grantable." *See* Transcript of FCC's Commercial FM Broadcast Application Construction Permit Seminar 41–50, *reprinted in* J.A. at 213–22. As one of fifteen factors reviewed at the grantability stage, the official listed "International Requirements," and stated: "If you're up close to the Canadian/US border, [or] you're down close to the Mexican border zone, there are certain international treaty requirements that need to be met." *Id.* at 46; J.A. at 218.[3]

The Commission sustained the rejections of both Malkan's and Trey's applications. *See Memorandum Opinion and Order, Texas Media Group,* 5 FCC Rcd 2851 (1990). Applicants had adequate notice, the Commission concluded, that compliance with the HAAT limitations of the U.S.–Mexico Agreement "is necessary to finding that an application is acceptable for filing"; "statements to the contrary by members of the staff," the FCC said, "do not warrant acceptance of a late filed amendment." 5 FCC Rcd at 2852.

Malkan and Trey appeal from the Commission's order upholding the rejection of their applications without opportunity for amendment.

## II.

Appellant Trey asserts that the Commission failed to provide sufficient notice that the U.S.–Mexico Agreement limited antenna height to 300 feet. Both appellants contend that the Commission's 1985 FM Rules do not make clear that compliance with international agreement is an "acceptability" factor that precludes the opportunity for a curative amendment. We address these arguments in turn.

---

**3.** Although Malkan's counsel attended the seminar, Malkan does not claim that it actually relied on this statement.

**1318**

A. *Notice Regarding Antenna Height Near U.S.–Mexico Border*

■ Trey argues that the Commission failed to comply with sections 552(a)(1) of the Administrative Procedure Act [4] by not publishing in the Federal Register adequate notice that the height limit prescribed by the U.S.–Mexico Agreement was lower than that prescribed by the Commission's general rules. Section 552(a)(1) is inapplicable to this case, however, because the 300–foot limit on antenna height is set by international agreement, binding upon the Commission, and not by "rule" of the FCC. *See, e.g., Hudson v. United States,* 766 F.2d 1288, 1291 (9th Cir.1985) (no publication required under APA section 552(a)(1) because agency action "is only the direct application of the plain terms of the statute supported by unambiguous legislative history") (citation omitted); *Welch v. United States,* 750 F.2d 1101, 1111 (1st Cir.1985) (same); *cf. Komjathy v. National Transp. Safety Bd.,* 832 F.2d 1294 (D.C.Cir.1987) ("The fact that the regulation merely reiterates the statutory language precludes any serious argument that the regulation affects [interested persons] in such a way as to require notice-and-comment procedures pursuant to 5 U.S.C. § 553.").

The U.S.–Mexico Agreement itself provides clear notice that antenna heights within the border area could not exceed 300 feet. The Commission's published rules adequately flagged the Agreement by noting that the U.S. "is a signatory to separate, bilateral agreements concerning FM broadcast stations with the governments of Canada and Mexico" and that these agreements are available for inspection and copying from the FCC. *See* 47 C.F.R. § 73.1650(b), (d) (1985).

■ We appreciate that the Commission would have better served its public had it included, after metrication, the 300–foot antenna height limit in its regulations on maximum antenna height. We note that the Commission did include a reference to the special requirements of the U.S.–Mexico Agreement in the regulations governing separation between stations. *See* 47 C.F.R. § 73.207(b)(3). A similar mention of the 300–foot antenna height limit in Mexican border areas would have afforded applicants a more salient cue. [5] Although the notice the Commission gave thus was less than the best, we do not find that the FCC's performance deserves a failing grade. Based on the reference to the existence of the U.S.–Mexico Agreement in the Commission's general rules, *see* 47 C.F.R. § 73.211, and the explicit statement in the 1985 FM Rules that antenna height is "limited in certain cases by international treaty," 50 Fed.Reg. at 19,946, we conclude that the Commission did enough to put appellants on notice that the U.S.–Mexico Agreement should be consulted before filing.

B. *Notice That Compliance with International Restrictions on Antenna Height Goes to "Acceptability" of an Application*

Malkan and Trey contend that, in framing the 1985 FM Rules on application processing, the Commission fell short of the clear statement obligation described by this court in *Salzer v. FCC,* 778 F.2d 869 (D.C. Cir.1985). In *Salzer,* we addressed similarly stringent acceptability standards in the context of FCC licensing of low power television (LPTV) stations. Appellants underscore this statement in *Salzer:* "[F]unda-

---

**4.** Section 552(a)(1) states that each agency must make available to the public "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretation of general applicability formulated and adopted by the agency" as well as "each amendment, revision, or repeal of the foregoing." 5 U.S.C. § 552(a)(1)(D), (E). The section further provides that "a person may not in any manner ... be adversely affected by ... a matter required to be published in the Federal Register and not so published." *Id.*

**5.** At oral argument, counsel for the Commission confirmed that the FCC was not relying on the mimeographed "Public Notice" of December 1985 as official notice that the U.S.–Mexico Agreement mandated a 300–foot antenna height limit in border areas. *Cf. Salzer v. FCC,* 778 F.2d 869, 874 (D.C.Cir.1985) (FCC counsel conceded that mimeographed form did not constitute official notice).

mental fairness ... requires that an exacting application standard, enforced by the severe sanction of dismissal without consideration on the merits, be accompanied by *full* and *explicit* notice of all prerequisites for such consideration." *Id.* at 871–72 (emphasis supplied); see also *Bamford v. FCC,* 535 F.2d 78, 82 (D.C.Cir.) ("[E]lementary fairness requires clarity of standards sufficient to apprise an applicant of what is expected."), *cert. denied,* 429 U.S. 895, 97 S.Ct. 255, 50 L.Ed.2d 178 (1976); *Radio Athens, Inc. v. FCC,* 401 F.2d 398, 404 (D.C.Cir.1968) ("When the sanction is as drastic as dismissal without any consideration whatever of the merits, elementary fairness compels clarity in the notice of the material required as a condition for consideration.").

The court in *Salzer* held that the FCC failed to provide adequate notice as to how and when applicants for LPTV stations were to include certain certifications and information on ownership characteristics. *See Salzer,* 778 F.2d at 874–76. The court found that the Commission had been unreasonably ambiguous by simultaneously requiring immediate submission of certain information and certifications for all pending applications, but suggesting that the submissions would be timely if made when a new official form became available, and failing to give public notice that, pending provision of the new form, an unofficial supplementary form was available. *See id.* at 875. As evidence of the deficient notice afforded by the FCC's LPTV licensing rules, the court noted that—with the exception of 9 applicants who had obtained the unofficial supplementary form—none of the other 44 applicants had managed to file the required information. *See id. Salzer*'s "full and explicit notice" phrasing, we think it critical, must be appraised in the context of the highly confusing situation that case presented.

In this case, the Commission's instructions for filing commercial FM applications were not similarly confused. Paragraph 4 of Appendix D to the 1985 FM Rules states that "[c]ompliance with the Commission's technical rules is evaluated in the course of an *acceptability* study" and that "the ab-

sence of one or more elements of those data, listed below, prevents a determination of *acceptability* and thus renders the application not substantially complete." 50 Fed. Reg. at 19,945 (emphasis supplied). Subparagraph (e) of Paragraph 4 identifies antenna height as an "elemental ... facility parameter" that must be included in an application, and further states that antenna height is "limited in certain cases by international treaty." *Id.* at 19,946.

The Commission's published rules put applicants on notice that the U.S. is a signatory to a "bilateral agreement[] concerning FM broadcast stations" with Mexico. *See* 47 C.F.R. § 73.1650(b) (1985); *supra* p. 1318. The U.S.–Mexico Agreement itself unambiguously states that antenna heights within 320 kilometers of the border are limited to 300 feet. *See* U.S.–Mexico Agreement, art. 3, § B(14), 24 U.S.T. at 1826, T.I.A.S. No. 7697, at 12; *id.,* art. 5, § A(6)(a), 24 U.S.T. at 1830, T.I.A.S. No. 7697, at 16. In contrast to the misleading form and timing instructions we confronted in *Salzer,* the Commission here conveyed explicit information adequate to alert an applicant's representative to the risk that noncompliance with the antenna height limit in the U.S.–Mexico Agreement would cause return of an application as unacceptable.

■ Again, we recognize that the Commission would have better served those subject to the FCC's governance had it elaborated further on the critical distinction between "acceptability" and "grantability." We are mindful that an FCC insider, at an official seminar, ranked compliance with international agreements as a factor going to grantability rather than acceptability. In the real world of agency practice, however, slips of this kind are not rare and should not engender reliance. *Cf. Schweiker v. Hansen,* 450 U.S. 785, 788–89, 101 S.Ct. 1468, 1470–71, 67 L.Ed.2d 685 (1981) (per curiam) (official's erroneous statement does not estop government agency from denying retroactive benefits). Finally, while the Commission did state that "compliance with the technical requirements for FM facilities" determined "ac-

ceptability," *see* 50 Fed.Reg. at 19,941, we remain in the dark as to what factors, if any, are appropriately considered at the "grantability" stage, other than issues raised in a petition to deny.

For the narrow question presented in this case, however, we are satisfied that the 1985 FM Rules, including Appendix D, explained with the requisite clarity (1) that antenna height was a factor to be considered at the acceptability stage of application, *see* 50 Fed.Reg. at 19,945, and (2) that, in some cases, antenna height was governed by international treaty, *see id.* at 19,946. Because the Commission's rules also gave adequate notice of the existence of the relevant international treaty, *see supra* p. 1318, we hold that the standard restated in *Salzer* has been met.[6]

### Conclusion

For the reasons stated, the Commission's Memorandum Order and Opinion dismissing the applications of Malkan and Trey for failure to comply with the HAAT limitation of the U.S.–Mexico Agreement is

*Affirmed.*

STEPHEN F. WILLIAMS, Circuit Judge, dissenting:

In *Salzer v. FCC,* 778 F.2d 869 (D.C.Cir. 1985), we addressed the problem of peculiarly unforgiving license schemes, where one false move is fatal to an applicant. Troubled by the potential for unfairness, but acknowledging the FCC's need for dispatch, we approved the general approach but held that "fundamental fairness" required that it "be accompanied by full and explicit notice of all prerequisites" for consideration. *Id.* at 871–72. Thus the issue here is not whether the Commission's after-the-fact readings of its rules are permissible. Compare *United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977) (exceptional deference due an agency's interpretation of its

own rules). The question is whether the rules, in light of the Commission's after-the-fact interpretation, afforded "full and explicit notice" within the meaning of *Salzer.* Although the majority acknowledges the confusion sown by the FCC in this case, it finds the *Salzer* requirement satisfied, thereby, in my view, diluting *Salzer* beyond recognition.

When the Commission "went metric" in 1983, adopting 100 meters rather than 300 feet as the maximum antenna height for Class A FM stations, it failed to note in its new regulations that the 1972 U.S.–Mexico Agreement[1] would thereafter provide an independent, lower constraint (300 feet) on antenna height for stations within 320 kilometers of the U.S.–Mexico border. As the Commission had incorporated into its rules the specific treaty requirements for distance separation between FM stations near the Mexican border, see 47 CFR § 73.207(b)(3) (1985), the combination (incorporation for one set, not for another) laid something of a false trail.

The Commission's non-incorporation also created confusion in relation to the key issue here—what criteria went to "grantability" of an application, and thus could be cured on notice from the Commission, and what criteria went to "acceptability", and could not. The Commission's sole guidance on that subject is Appendix D, a policy statement attached to its 1985 FM Rules, *Processing of FM and TV Broadcast Applications, Report and Order,* 50 Fed.Reg. 19,936 (1985). Appendix D, titled "Statement of New Policy Regarding Commercial FM Applications That Are Not Substantially Complete or Are Otherwise Defective," 50 Fed.Reg. at 19,945, gives this terse explanation of "acceptability": "An application found to be sufficient for tender will be studied to determine its acceptability for filing, that is, to determine whether it is in compliance with *applicable Commission rules.*" *Id.* at 19,946/2 (emphasis added);

---

6. In view of the bright line drawn by treaty, we find unpersuasive appellant Trey's argument that because its variance from the mandated HAAT limit was de minimis, the dismissal of its application was fundamentally unfair.

1. Agreement on Radio Broadcasting in the Standard Broadcast Band, Nov. 9, 1972, United States–Mexico, art. 5, § A(6)(a), 24 U.S.T. 1815, 1830, T.I.A.S. No. 7697, at 16.

see also *id.* at 19,945/3 ("Compliance with *the Commission's technical rules* is evaluated in the course of an acceptability study.") (emphasis added).

But the height limits of the U.S.–Mexico Agreement are *not* part of the Commission's rules. It is precisely on this basis that the court quite properly finds that the FCC's failure to publish them in the Federal Register was not a violation of Administrative Procedure Act's publication requirement. See 5 U.S.C. § 552(a)(1) (1988); Maj. Op. at 9. Although Appendix D notes that "[a]ntenna height is also limited in certain cases by international treaty", 50 Fed.Reg. at 19,946/1, nothing in either the Commission's substantive rules or in Appendix D incorporates the treaty limitations into the Commission's "rules". Thus Appendix D made conformity to the Commission's "rules" the condition of "acceptability", but nothing made the treaty a part of the rules.

Petitioners are not the only ones confused. Malkan points to evidence that nine other applicants for new FM stations in South Padre Island, Texas, proposed antenna heights that violated the treaty provisions, whereas only five complied. See Brief for Appellant Malkan at 10 n. 9, 23–24 & n. 15. In the FM licensing case that first revealed the FCC's present reading of Appendix D, eight of the eleven applicants proposed antenna heights above the treaty limit. *Kerrville Radio*, 2 FCC Rcd. 3441 (1987). If these figures are representative, the Commission was managing to strike out nearly seven of every ten applicants—very impressive, if one were to grade the Commission by its ability to throw out applications.

Nor was confusion limited to aspirants for the Commission's favor. In a public seminar touted by the Commission as devised to "educate" the public about the new procedures, and attended by the Chiefs of the FCC's Mass Media Bureau, Audio Services Division and FM Branch, the staff member conducting the seminar described compliance with international treaty obligations as a "grantability" issue, i.e., one not subject to the "sudden death" of an "acceptability" foul-up. See Transcript of "How to Apply for Construction Permits for FM Commercial Broadcast Stations", Joint Appendix at 186–88, 218; see also Maj.Op. at 1317. Of course, this presentation does not bind the agency, see Maj.Op. at 1319, but it is surely evidence that even for experts, responsible for carrying out the Commission's regulations day in and day out, the Commission's rules and policy statement lacked the clarity that the Commission now claims and the court discerns.

I would reverse the Commission's decisions denying Malkan and Trey leave to amend their applications.